**Estate of William KAHR (also known as William Carr) deceased, James F. Dalton, Executor, and Mary Zangerle (formerly known as Mary K. Kahr and Mary Carr) surviving wife, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 277, Docket 32737.**

United States Court of Appeals Second Circuit.

Argued April 16, 1969.

Decided Aug. 1, 1969.

Joseph J. Casey, William Toomey, Albany, N. Y., for appellees.

Frank X. Grossi, Jr., Lee A. Jackson, Joseph M. Howard, Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., for appellant.

Before WATERMAN, SMITH and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

The Estate of William Kahr, deceased, James F. Dalton, Executor, and William Kahr's surviving wife, now Mary Zangerle, petitioned the Tax Court for a redetermination of deficiencies in income tax and fraud additions, in the aggregate amounts of $25,575.19 and $13,803.62 respectively, assessed jointly against the estate and the wife for the taxable years 1958 and 1959. The Tax Court, 48 T.C. 929 (1967), sustained the assessed deficiencies except for the civil fraud addition assessed for the taxable year 1959. Five judges would have sustained the entire 1959 assessment, 48 T.C. 938. The Commissioner of Internal Revenue appeals from that part of the Tax Court decision which held that Kahr's estate and wife were not subject to any 1959 civil fraud additions. No appeal has been taken from the 1958 determination and no cross appeal has been filed by appellees with reference

to the 1959 determination. Jurisdiction is conferred on this court by 26 U.S.C. § 7482. The facts found by the Tax Court are not disputed by the parties. We reverse in part and affirm in part that portion of the order of the Tax Court which the Commissioner has appealed.

William Kahr (hereinafter referred to as "Kahr") and Mary Zangerle were husband and wife during the calendar years 1958 and 1959. Kahr died in January 1960. Joint federal income tax returns were filed for Kahr and his wife for 1958 and 1959, the 1959 return having been filed out of time after Kahr's death. The 1959 return was signed by Mary Kahr and by Kahr's executor, James F. Dalton.

In 1958 and 1959 Kahr held a 50 per cent partnership interest in the Hamilton News Company (News), a newspaper and periodical distributor in Albany, New York. During these two years Kahr, the managing resident partner, ran this business. Leon Mohill, who held the other 50 per cent interest in News, lived in Pittsfield, Massachusetts, about 35 miles away, and came to the News offices only once or twice a year.

Normally the News bookkeeper opened all mail, recorded on a daily cashier's report all checks received, and posted the amounts to the proper ledger accounts. In 1958 and 1959, however, Kahr, through carefully controlling the incoming mail, was able to remove checks before they could be recorded and thus was able to divert large amounts of partnership income to himself. The checks removed from the normal flow of mail were from three companies: Union News Company, Holland Paper Stock Co., Inc., and Time, Inc. A single check from Caterpillar Tractor Co. was also removed.[1]

Acting upon orders from Kahr, Charles Fruscione, the manager of News who was under the direct supervision of Kahr, sorted all mail before it was given to the bookkeeper for processing. Fruscione was able to do this because his primary duty was to see that all operations were running smoothly and therefore his work included the supervising of the daily receipts and the disbursements of cash. Whenever Fruscione came across an envelope from one of the three above mentioned companies he would keep it and then give the rest of the mail to the bookkeeper unopened. Fruscione would then extract any checks in these envelopes until, upon order from Kahr, he would cash the accumulated checks and hand the proceeds to Kahr.

Beginning in September 1959 Fruscione and Kahr were both ill and unable to be at the office for approximately eight weeks. During this period the bookkeeper was ordered to send a delivery boy to Kahr's home each day with the unopened mail and she received at least a part of it back unopened. In fact, during the latter part of 1959, six checks sent by Union News, totaling $14,821.62, reached the bookkeeper for processing and actually were recorded on the company records of receipts.

Normally News kept records of the amounts due it from customers and its billing department made up and sent out statements showing the amount due News. Copies of these statements were given to the bookkeeper, who used them as an accounts receivable control ledger. No records, however, were kept by News of the amounts due it from Holland Paper, Caterpillar Tractor, or Time, Inc. These companies were trusted to keep accurate records of their own indebtednesses and to pay periodically the sums they owed News. And, in the case of

1. Checks in the following amounts were removed from the mail, cashed, and the money received kept by Kahr:

| Customer | 1958 | 1959 |
|---|---|---|
| Union News Company | $37,881.31 | $19,568.55 |
| Holland Paper Stock Co., Inc. | 834.32 | 2,259.56 |
| Time, Inc. | 1,650.00 | 1,650.00 |
| Caterpillar Tractor Co. | — | 30.00 |

Union News, although records were kept by News of that account, Fruscione upon order from Kahr, received the copy of the customer billing statement instead of the bookkeeper. These billing statement copies were separately filed in Kahr's office where they were kept until late 1959 or early 1960 when Fruscione, on Kahr's orders, destroyed them.

At all times Fruscione acted pursuant to Kahr's personal orders. Once Fruscione questioned the propriety of the orders and at that time he was told by Kahr "to mind * * * [his] own business." After Kahr died Fruscione discontinued the practice of extracting the checks and all checks received by News from all of its accounts were recorded on News's books.[2]

News's partnership income tax returns for 1958 and 1959 were prepared by certified public accountants from News's books and records and as the diverted amounts retained by Kahr had not been recorded in News's books and records the filed returns understated the partnership income by the withheld amounts. The 1958 partnership return, signed by Kahr as partner, showed Kahr's share of the partnership income to have been $11,715.70, and this figure was then set forth on the joint return filed by Kahr and his wife for the year 1958 as Kahr's personal total adjusted gross income. The 1959 partnership return, signed by Mohill and filed subsequent to Kahr's death, showed Kahr's share of the partnership income to have been $16,065.95. This amount was then entered as Kahr's distributive share on the 1959 joint return of the Kahrs, signed by the executor for Kahr and by Mary Kahr as surviving spouse.

The Commissioner determined deficiencies in Kahr's distributive shares of partnership income to be one half of the sum of the checks diverted and kept by Kahr during the respective tax years plus one half of disallowed partnership expenses of $1,040 (a deduction not in issue) in each year. The Commissioner also determined that the taxpayer had additional unreported income, the income obtained through the embezzlement of his partner Mohill's distributive share, the other one half of the purloined partnership checks.[3] Fraud penalties were assessed for each year in issue, and for 1959 the "underpayment" to which the 50 per cent addition was applied was determined to be the corrected tax liability rather than the liability computed upon the underpayment, because the 1959 return was not timely filed. 26 U.S.C. § 6653(c).

The Tax Court sustained the deficiencies for 1958 and 1959 and the civil fraud addition for 1958. It held, however, that as the return for 1959 was not executed and filed by Kahr himself the civil fraud addition for 1959 was improperly assessed. 48 T.C. 929. Only the civil fraud additions assessed against Kahr's adjusted 1959 taxable income are in issue on appeal. For reasons stated below, we reverse the Tax Court and uphold the Commissioner's assessment of the civil fraud addition on Kahr's 1959 distributive share of the unreported

---

2. Upon Kahr's death Leon Mohill, Kahr's partner, became the sole owner of News. Prior to this time Mohill had no direct contact with the daily operations of News and did not participate in any of the transactions detailed above.

3. The Commissioner's statutory notice of deficiency stated that the following adjustments were to be made to the taxpayer's 1959 income tax return:

Taxable Year Ended December 31, 1959

*Adjustments to Income*

| | | |
|---|---|---|
| Taxable income as disclosed in return ........... | | $ 8,662.42 |
| Unallowable deductions and additional income: | | |
| (a) Partnership income ........................ | 12,274.06 | |
| (b) Embezzlement income ...................... | 11,754.05 | 24,028.11 |
| Taxable income as corrected ..................... | | $32,690.53 |

partnership income, and we affirm the Tax Court decision for different reasons than those advanced by the Tax Court that no civil fraud addition could properly be assessed against Kahr's 1959 income received by his embezzlement from Mohill.

The direct end result of Kahr's systematic embezzlement activities in 1959 was the understatement of the News partnership income; this proximately caused the filing of a personal income tax return signed by his wife and his executor which grossly understated his personal 1959 taxable income. It is undisputed that if Kahr himself had not died and had filed the same identical personal 1959 tax return, the Commissioner properly could have assessed a 50 per cent civil fraud addition to the tax due on Kahr's unreported taxable share of the partnership income. 26 U.S.C. § 6653; see Jackson v. Commissioner of Internal Revenue, 380 F.2d 661 (6 Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). Kahr, however, died in January 1960, after the close of the 1959 tax year, but before April 15, 1960, when the 1959 return was finally due, and did not file or sign the 1959 personal tax return which understated his share of the partnership income during that year. Petitioners therefore reason that the civil fraud addition cannot attach and be assessed unless at the time of the filing of the return the person or persons responsible for filing the tax return have a fraudulent intent to evade the tax, and it is conceded that neither Kahr's wife nor his executor had any such intent at the time the 1959 return was filed. The Tax Court majority accepted this reasoning, but we do not accept it.

Despite the existence of a civil fraud addition provision in both the 1939 Internal Revenue Code, ch. 2, § 293(b), 53 Stat. 88, and the 1954 Internal Revenue Code, 26 U.S.C. § 6653(b), and, indeed, in the Internal Revenue Act of 1924, title II, part V, § 275(b), this case is one of first impression. In the only somewhat similar case we have discovered, Estate of Ginsberg v. Commissioner of Internal Revenue, 271 F.2d 511 (9 Cir. 1959), the Ninth Circuit held both the taxpayer's estate and his surviving wife jointly liable for the civil fraud addition, but in doing so did not consider whether the absence of a tax return personally filed by the deceased taxpayer prohibited the imposition of the civil fraud addition. Therefore, for our resolution of this issue we must examine the statutory language in the light of the policies underlying the 50 per cent civil fraud addition provision.

The central issue is whether the 1959 underpayment was "due to fraud" as that term is used in 26 U.S.C. § 6653(b) which states that:

> (b) Fraud.—If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *

The Tax Court in holding that the underpayment was not "due to fraud" did so on the ground that an essential element of fraud as used in Section 6653(b) is the knowing and wilful filing of a fraudulent return. We believe that the Tax Court erred in bottoming its determination of the problem upon the necessity of first finding that a return had been filed by someone who had, at the time of filing, an intent to defraud.

Cases abound in which the Commissioner's assessment of the civil fraud addition has been upheld when no return at all has been filed by the taxpayer if the failure to file was motivated by an intent to evade taxes which the taxpayer knows are owed the Government. E. g., Stoltzfus v. United States, 398 F.2d 1002 (3 Cir. 1968), cert. denied, 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969); Irolla v. United States, 390 F.2d 951, 182 Ct.Cl. 775 (1968) (per curiam); Powell v. Granquist, 252 F.2d 56 (9 Cir. 1958) (1939 Code). It, therefore, is obvious that it is not indispensable to a finding of fraud under 26 U.S.C. § 6653(b) that a return has been

filed and that the court find that the return was a fraudulent return and the taxpayer personally and knowingly filed it with an intent to evade taxes. Thus where there is past conduct by a deceased taxpayer unequivocally demonstrating his intent fraudulently to conceal taxable income and to avoid paying lawful taxes and his testator's conduct is the direct and proximate cause of the filing of a tax return for the taxpayer by the executor which, unknown to the executor, understates the taxpayer's income, the absence of a tax return personally signed and filed by the fraudulent taxpayer should not bar the Commissioner from assessing the 50 per cent civil fraud addition, and from seeking its collection from the funds of the estate.

It seems impermissible for the estate of a deceased taxpayer, who during his lifetime established a pattern of conduct by which he fraudulently avoided taxes, to avoid a liability that the taxpayer himself could not have avoided if his conduct had been uncovered while he was alive. If Kahr were still living he would be liable for the civil fraud addition. E. g., Jackson v. Commissioner of Internal Revenue, supra. Also, if the tax fraud were committed and a fraudulent return filed before the taxpayer's death but the fraud was not discovered until after his death, liability for a civil fraud addition imposed as a result of the taxpayer's tax evasion activities during his lifetime would survive his death and be borne by his estate. E. g., Estate of Rau v. Commissioner of Internal Revenue, 301 F.2d 51 (9 Cir.), cert. denied, 371 U.S. 823, 83 S.Ct. 41, 9 L.Ed.2d 62 (1962); Estate of Reimer v. Commissioner of Internal Revenue, 12 T.C. 913 (1949), affirmed per curiam, 180 F.2d 159 (6 Cir. 1950). A purpose of Section 6653(b), like that of its predecessors, e. g., § 293(b) of the 1939 Code, is to protect the tax revenue and to reimburse the Government for the public funds which must be expended in the investigation and uncovering of taxpayer tax evasion activities. E. g., Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938). The Government is entitled to this reimbursement whether the taxpayer be alive or dead. See, e. g., Kirk v. Commissioner of Internal Revenue, 179 F.2d 619, 15 A.L.R.2d 1031 (1 Cir. 1950). Death may be an avenue of escape from many of the woes of life, but it is no escape from taxes. The fact that Kahr's tax evasion activity in 1959 was not comprehended within a tax return until some months after his death does not relieve his estate of liability when Kahr's fraudulent conduct caused the estate to file the return which understated his income. A need to reimburse the Government for its loss through fraud and for its expenditures in discovering and uncovering fraud survives the life of the discovered defrauder.

It is argued that if Kahr had lived he might have had a "change of heart" and might have filed a tax return for 1959 stating all of his 1959 taxable income, 48 T.C. at 937, and we should presume that he would have done so. But this is not a situation where there had been no prior fraudulent conduct or no prior filing of fraudulent returns by a taxpayer; here the taxpayer's past conduct negates any real possibility of his undergoing any "change of heart."

We therefore hold that the 50 per cent civil fraud addition may be assessed on the taxes owed by Kahr's estate on that one half of the secreted partnership income which represents Kahr's distributive share of the unreported profits of the partnership.

## II.

That part of the secreted partnership profits which constituted Kahr's partner Mohill's distributive share of News's 1959 profits and which were funds Kahr embezzled from his partner poses a problem different from the problem discussed in Part I of this opinion. During the year in issue, 1959, embezzled funds were deemed not to constitute taxable income to the embezzler in the year of the embezzlement. Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404,

66 S.Ct. 546, 90 L.Ed. 752 (1946). Although the *Wilcox* decision was undermined by Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952), which held that extorted monies were taxable income to the extortionist in the year the monies were received, *Wilcox* itself was not overruled until the 1961 Supreme Court decision in James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), which held that embezzled funds were to be considered taxable income of the embezzler in the year of the embezzlement.[4] The Court in *James* stated, however, that James's felony conviction for wilful tax evasion must be reversed because

> \* \* \* the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was committed. 366 U.S. at 221–222, 81 S.Ct. at 1057.

▮ The statute here is one that provides for a civil fraud addition and not, as in *James*, for a criminal fraud penalty. Compare 26 U.S.C. § 6653(b) with 26 U.S.C. § 7201. However, the requirements that specific intent be proved before either the civil fraud addition may be assessed or the criminal sanction may be imposed are identical. See Estate of Adame v. Commissioner of Internal Revenue, 320 F.2d 811 (5 Cir. 1963) (Lumbard, C. J., sitting by designation); Rohde v. United States, 273 F.Supp. 190 (E.D.Wis.1967).[5] Inasmuch as embezzled funds were not taxable income in the year of embezzlement, 1959, Kahr, like James, by failing to report what was non-taxable income,

could not, in legal contemplation, have formed the intent necessary to commit a tax fraud. Therefore, it was improper for the Commissioner to assess the civil fraud addition on that part of the secreted monies which were embezzled from Mohill and which constituted embezzled funds in Kahr's hands.

The decision of the Tax Court is reversed in part and affirmed in part.

---

4. *James* has been interpreted to permit the retroactive application of its definition of taxable income for purposes of civil nonfraud deficiency assessments. E. g., United States v. Siano, 356 F.2d 927 (2 Cir. 1966); Estate of Geiger v. Commissioner of Internal Revenue, 352 F.2d 221, 227 (8 Cir. 1965), cert. denied, 382 U.S. 1012, 86 S.Ct. 620, 15 L.Ed.2d 527 (1966).

5. See also Estate of Geiger v. Commissioner of Internal Revenue, *supra* at 223, n. 1; cf. United States v. Siano, *supra*; compare United States v. McGuire, 347 F.2d 99 (6 Cir.), cert. denied, 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); United States v. Jannsen, 339 F.2d 916, 917 (7 Cir. 1964).