Howard A. Cozad v. Commissioner.
Cozad v. Commissioner
Docket No. 2510-70.
United States Tax Court
T.C. Memo 1971-272; 1971 Tax Ct. Memo LEXIS 60; 30 T.C.M. (CCH) 1166; T.C.M. (RIA) 71272; October 27, 1971, Filed. Leo Eisenstatt, 707 City Nat'l Bk. Bldg., Omaha, Neb., J. Patrick Green, for the petitioner. Roy S. Fischbeck, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following Federal income tax deficiencies and additions to tax against the petitioner: *61 Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1960
$3,722.39
$1,861.20
1961
1,003.57
1,280.32
1962
2,778.08
4,360.37
1963
6,291.96
Petitioner has conceded that the correct net operating loss carryback from the year 1964 is $65,032.15, as determined by the respondent. There are three issues remaining for decision: (1) Whether petitioner understated his taxable income during the years 1960 through 1963 resulting in deficiencies in his Federal income tax for those years; (2) whether any part of the underpayment for each of the years 1960 through 1963 was due to fraud with intent to evade tax; and (3) whether assessment of any deficiencies determined for the years 1960 and 1961 is barred by the statute of limitations. Findings of Fact The parties have stipulated certain facts which are incorporated herein by this reference. was a legal resident of Schuyler, Howard A. Cozad (herein called petitioner) Nebraska, at the time he filed his petition was a legal resident of this in this case. During the calendar years 1960 *62 through 1962 and as of December 31 of each of the years, petitioner and Jean Cozad, now Jean McAferty, were husband and wife. They filed joint Federal income tax returns for each of the taxable years 1960 through 1962 with the district director of internal revenue at Los Angeles, California. Petitioner was an unmarried person as of December 31, 1963. He filed his separate Federal income tax return for the taxable year 1963 with the district director of internal revenue at Denver, Colorado. Petitioner graduated from high school in 1938, and in that same year he married Jean Cozad. He immediately went to work as a bookkeeper for the Coca Cola Company in Joplin, Missouri, at a salary of $35 per week. Later he worked for Eagle-Pitcher Mining and Smelting Company in Joplin, at a salary of $45 weekly. That job lasted about two years. He then went into the Army for 18 months during World War II. He was discharged with the rank of technical sergeant and returned to his prior employment as a bookkeeper with Eagle-Pitcher Mining and Smelting Company, receiving $65 to $70 per week. In 1943 the petitioner inherited $5,000 from his father. Later, but prior to 1960, he received gifts and inheritance *63 from his mother of about $4,000. On December 16, 1945, petitioner and Jean Cozad opened a checking account at the First National Bank of Joplin, Missouri. From that date until October 6, 1947, the account balance ranged from $.38 to approximately $5,000, and various withdrawals therefrom and deposits thereto were made at the times and in the amounts as follows: Date
Deposit
Withdrawal
2- 5-46
$4,845.00
6- 3-46
1,472.24
5-21-47
3,000.00
5-22-47
$1,500.00
On or about February 11, 1946, petitioner and Jean Cozad purchased for about $7,000 a residence located at 1711 Bird, Joplin, Missouri. In connection therewith, they executed and delivered their promissory note and a deed of trust in the amount of $2,250, with six percent interest per annum, payable in successive monthly installments of $40 beginning March 10, 1946. This mortgage debt was satisfied and discharged of record as of February 15, 1947. On August 15, 1947, petitioner and Jean Cozad mortgaged their residence situated at 1711 Bird, Joplin, Missouri, in the amount of $3,000, with interest thereon, to be paid in monthly installments, the last installment due March 1, 1957. In 1947 *64 petitioner terminated his employment as a bookkeeper at Eagle-Pitcher Mining & Smelting Company and purchased a partnership interest in a firm doing business under the franchise trade name of Mail-Me-Monday, a bookkeeping and tax service. He paid about $1,000 for his interest in the business. Later the interests of the other partners were purchased by petitioner for $3,500, and the business thereafter operated as a copartnership composed of petitioner and Jean Cozad, with five employees. On September 24, 1948, petitioner opened a checking account at First National Bank of Joplin, Missouri. During the period of this account to August 13, 1949, the balance of such account ranged from $.32 to $748.61. On November 3, 1948, petitioner and Jean Cozad mortgaged their residence situated at 1711 Bird, Joplin, Missouri, in the amount of $4,700, with interest thereon. The mortgage provided for its payment in installments, the last installment being due and payable on December 1, 1968. On June 1, 1951, petitioner and Jean Cozad executed and delivered their installment note, together with a mortgage on their residence, in the amount of $11,117.30, with interest at the rate of six percent *65 per annum, payable in successive monthly installments of $150 beginning June 1, 1951. As further security for the payment of this 1168 note, they executed and delivered their chattel mortgage of the same date and in the same amount covering certain office equipment consisting of multipliers, calculators, and typewriters therein described. These mortgages were subject to the $4,700 real estate mortgage executed by them on November 3, 1948. On March 18, 1952, a Sale and Purchase Agreement was executed by petitioner and Jean Cozad, as sellers, and Earl E. Wert, as purchaser. The agreement provided for the sale of the Mail-Me-Monday business for $31,700. The purchase price was paid as follows: Date
Amount
March 18, 1952
$ 8,000.00
June 1952
7,000.00
April 25, 1952, through March 1957; 60 payments of $200 each
12,000.00
April 1957
4,700.00
During the period from March 1 through May 15, 1952, Earl E. Wert received the sum of $2,883.88 from payments upon the accounts receivable retained and owned by petitioner and Jean M. Cozad under the provisions of the agreement. Against such sum Earl E. Wert claimed as a setoff $718.77 for payments made on behalf of *66 petitioner and remitted to petitioner and Jean M. Cozad the net sum of $2,165.11 in installments as follows: March 13, 1952
$500.00
March 28, 1952
500.00
April 26, 1952
200.00
May 15, 1952
965.11
During the period May 15 through May 24, 1952, Earl E. Wert received checks constituting payments on the accounts receivable. These checks, which totalled $335.01, were transmitted directly to petitioner by Earl E. Wert. During the period May 25 through July 7, 1952, Earl E. Wert received checks constituting payments on the accounts receivable. These checks, which totalled $248.50, were transmitted directly to petitioner by Earl E. Wert. No payments upon the accounts receivable were received by Earl E. Wert after July 7, 1952. After the sale of the bookkeeping business, petitioner and his family moved to Birmingham, Alabama, where he went to work for a paint company as a traveling salesman. After approximately one and one-half years, during which time his annual earnings were about $7,000, petitioner and his family returned to Joplin, Missouri, where he went to work as a bookkeeper for Thurston Chemical Company at a salary of $5,400 annually. At that time petitioner *67 and his family moved into a house for which they paid rent of $65 monthly. A Certificate of Assessments and Payments (Form 4340) shows the transfer of a delinquent Federal tax account of petitioner and Jean M. Cozad in the amount of $1,816.98 from Alabama to Missouri on July 16, 1953. It further shows that the account, plus assessed interest, was satisfied on an installment basis on the dates and in the amounts as follows: Date
Payment or Credit
September 22, 1953
$ 10.00
December 7, 1953
10.00
February 1, 1955
50.00
March 3, 1955
50.00
April 1, 1955
50.00
June 3, 1955
50.00
July 5, 1955
100.00
August 11, 1955
290.13
August 16, 1955
100.00
September 6, 1955
50.00
October 7, 1955
50.00
October 10, 1955
50.00
November 3, 1955
100.00
November 28, 1955
1,077.59
On December 15, 1953, petitioner and Jean M. Cozad opened a checking account at Citizens Bank, Joplin, Missouri. During the period from December 6, 1954, to December 31, 1956, the balance of the account ranged from a high of $1,953.58 as of November 28, 1955, to a low of zero as of December 31, 1956. The following deposits were made in part to this account on the dates and in the *68 amounts as indicated: Date
Amount
June 27, 1955
$200.00
July 26, 1955
200.00
August 26, 1955
200.00
September 27, 1955
200.00
October 26, 1955
200.00
January 28, 1956
200.00
February 28, 1956
200.00
March 27, 1956
200.00
April 26, 1956
200.00
May 26, 1956
200.00
July 26, 1956
200.00
August 27, 1956
200.00
September 26, 1956
200.00
Installment Loan Ledgers of Citizens Bank, Joplin, Missouri, disclose that petitioner obtained installment loans from Citizens Bank on the dates, in the amounts, and with monthly payments as follows: Monthly
Date
Amount
Payment
January 4, 1954
$1,425.24
$ 79.18
May 29, 1954
1,030.05
57.23
September 23, 1954
1,700.00
94.45
July 22, 1955
904.70
50.26
November 23, 1955
2,216.16
123.12
May 4, 1956
260.00
43.34 1169 On March 8, 1954, in connection with the purchase of an Underwood typewriter, petitioner executed and delivered his note to Joplin Typewriter Company in the amount of $176.96 payable in 17 successive monthly installments of $9.75 each and one final installment of $11.21 due September 15, 1955. This note was paid in full on July 6, 1955. On or about *69 October 9, 1956, petitioner and Jean M. Cozad opened a checking account at First National Bank of Joplin, Missouri. During the period of this account to June 25, 1957, the balance of the account ranged from a high of $3,901.47 as of April 25, 1957, to a low of $13.77 as of November 26, 1956. Deposits to this account were made in part on the dates and in the amounts as follows: Date
Amount
October 29, 1956
$ 200.00
November 19, 1956
2,000.00
November 27, 1956
200.00
December 28, 1956
200.00
January 28, 1957
200.00
February 26, 1957
200.00
April 1, 1957
200.00
April 25, 1957
3,908.00
When petitioner's employer moved its office to Oklahoma in 1956, petitioner worked a few months as a bookkeeper for a building firm, then accepted employment as assistant secretary of an insurance firm in Joplin, Missouri, receiving a salary of $6,600 annually. On October 23, 1956, and February 20, 1957, petitioner and Jean M. Cozad obtained mortgage loans in the respective amounts of $15,000 and $1,000 from Joplin Federal Savings and Loan Association, Joplin, Missouri. Incidental therewith they executed and delivered to the Association their firstmortgage notes, together *70 with two executed and related deeds of trust covering real estate situated at 400 West 42nd Street, also known as 4111 Jackson Street, Joplin, Missouri. These loans and notes were collectively payable in successive monthly installments of $153.18 beginning March 1, 1957, and carried interest at five and onehalf percent per annum. The proceeds from these loans were utilized in connection with the construction of a personal residence upon the above-described and mortgaged premises and were disbursed as follows: $333.65 to loan costs and $15,666.36 to numerous materialmen, suppliers, subcontractors, and a contractor. On November 12, 1956, petitioner opened a building-construction account at First National Bank of Joplin, Joplin, Missouri. During the period of this account to August 20, 1957, the account balance ranged from $2,000, when opened, to zero when closed. On March 19, 1957, petitioner and Jean M. Cozad made and delivered to First National Bank of Joplin their note in the amount of $150 due April 18, 1957. On October 24, 1957, petitioner made and delivered to Home Conditioning Company, Joplin, Missouri, his note in the amount of $1,462.20 payable in successive monthly installments *71 of $50 each. On June 30, 1958, petitioner and Jean M. Cozad made and executed their first mortgage note to Joplin Federal Savings and Loan Association in the amount of $1,100, with interest thereon at five and one-half percent per annum, together with an additional mortgage on the premises situated at 400 West 42nd Street, Joplin, Missouri. By reason of this indebtedness, their monthly mortgage payments to such Association collectively increased to $162.59 beginning August 20, 1958. During the period November 25, 1958, through February 11, 1960, petitioner maintained a checking account at First National Bank of Joplin, Missouri. For such period the account balance ranged from a high of $3,274.53 as of November 3, 1959, to a low of $4.95 as of February 27, 1959. On December 12, 1958, petitioner and Jean M. Cozad entered into a loan-reamortization agreement with Joplin Federal Savings and Loan Association, Joplin, Missouri, to provide for and to effect a reduction in the payment of the collective mortgage payment from $162.59 to $136. A Certificate of Assessments and Payments (Form 4340) for petitioner and Jean M. Cozad, dated March 15, 1971, discloses that they filed their joint *72 Federal income tax return for 1958 on June 16, 1959, without remittance, and that income tax in the amount of $356.92 was assessed on July 10, 1959. After notice on July 15, 1959, the delinquent account was paid on September 28, 1959. On October 13, 1959, petitioner and Jean M. Cozad made and executed their first mortgage note to Joplin Federal Savings and Loan Association in the amount of $880, with interest thereon at five and onehalf percent per annum, together with an additional mortgage on the premises situated at 400 West 42nd Street, Joplin, Missouri. On the same date they entered into a loan-reamortization agreement with Joplin 1170 Federal Savings and Loan Association, Joplin, Missouri, to continue and maintain their collective monthly mortgage payment of $136 despite the $880 increase in unpaid principal. On November 4, 1959, petitioner and Jean M. Cozad made and delivered to First National Bank of Joplin, Missouri, their note in the amount of $2,812.50 payable in 29 monthly installments of $94 each beginning December 15, 1959, and one installment of $86.50 due May 15, 1962. The records of the Recorder of Deeds for Newton County, Missouri, indicate that a chattel *73 mortgage from petitioner to First National Bank of Joplin in the amount of $2,812.50 covering a 1959 Chevrolet automobile and furniture was filed and recorded on November 5, 1959, and satisfied on March 21, 1961. In December 1959, petitioner resigned his position with the insurance company and accepted on a trial basis employment as a bookkeeper for Peterson Breeding Farms in Arkansas at $700 monthly. On February 16, 1960, petitioner and Jean M. Cozad made and delivered to First National Bank of Joplin, Joplin, Missouri, their note in the amount of $545.50 payable in 12 successive monthly installments beginning March 16, 1960. This note was fully paid on March 17, 1961. Three children were born of the marriage between petitioner and Jean M. Cozad in 1939, 1943, and 1946, respectively. From their births to June 1960, the children lived with and were supported by their parents. In May 1960, petitioner left his family at Joplin and went to San Diego, California, where his brother resided, to seek employment. Within a week after his arrival he obtained employment with Everts & Esenoff, a public accounting firm whose services had just been retained by Ogden B. Armour, owner and *74 president of Armour Oil Company and Armour Management Corporation, at a monthly fee of $4,000. Armour Oil Company was then and is now a corporate jobber engaged in the wholesale of petroleum products and automotive accessories. Armour Management Corporation is a holding company embracing about 35 corporations which are engaged in the business of retailing petroleum products and automotive accessories in 21 states, including Hawaii. In 1970 it grossed $69,000,000 and employed 1,100 persons. It was formed in 1960 upon the advice of attorneys and accountants for Ogden B. Armour (sometimes hereinafter called Armour) to acquire ownership of at least 24 automotive service stations and retail outlets previously built and acquired by Armour individually with borrowed corporate funds in excess of $300,000. Such funds had been charged to Armour's personal account on the corporate books. This transfer of assets to the corporation was made to liquidate the large indebtedness of Armour to the corporation created by his personal acquisition of the retail outlets with borrowed corporate funds. Upon transfer of these retail outlets to Armour Management Corporation, Armour's personal account was *75 credited accordingly. After several days of office indoctrination at Everts & Esenoff, petitioner was assined to work with the books and records in the common offices of Armour Oil Company and Armour Management Corporation (sometimes hereinafter referred to as the corporation) and to perform the duties of a controller. In such capacity petitioner was authorized and entrusted by Armour to assume complete control of all accounting for the corporation; to maintain and control all books and records of the corporation, as well as to personally keep the personal books and records of Armour; to handle all financial transactions for the corporation and for Armour personally, including the sale of oil properties owned by Armour individually, as well as the receipt and disposition of sale proceeds therefrom; and to write, sign, endorse, and cash checks drawn upon the accounts of the corporation and of Armour. At the time of petitioner's assignment to the corporation by Everts & Esenoff, the business enterprises of Armour were experiencing financial difficulties created by the payment and satisfaction of two legal claims instituted by a petroleum supplier, Golden Eagle Refinery Company, for *76 approximately $210,000 and $550,000. The lesser claim was satisfied with funds loaned to Armour by a business supplier, Wilshire Oil Company, and the larger suit was paid by the corporation on a deferred basis of $50,000 weekly for 11 successive weeks. This placed the corporation in financial straits for a substantial period of time. Upon his assignment to the corporation, petitioner arranged for Betty Moss, an employee of Everts & Esenoff, to be transferred to and employed by the corporation 1171 as head bookkeeper. He further arranged to terminate and to replace the services of some of the corporation's bookkeepers. During the taxable years involved herein the corporation maintained an active checking account at United California Bank, successor to First Western Bank and Trust Company, San Diego, California. A personal checking account was also actively maintained at the same bank by Armour until sometime in early 1963 when he established his personal account at the Bank of La Jolla, California, a newly-organized bank in which he was one of the original stockholders. Checks drawn upon the corporation's checking account during 1960 and 1961 required two signatures. Authorized *77 signatories Rathbun, the corporation's retail sales were Armour, petitioner, and Glen manager. During the taxable years involved herein the corporation's business required extensive travel by Armour and Rathbun away from San Diego. By reason thereof, during 1960 and 1961 it occasionally was their practice prior to departure from San Diego to sign in blank corporate checks to permit petitioner to handle corporate expenditures during their absences. Beginning in 1962 arrangements were made to authorize and to utilize a facsimile signature of Armour on all checks drawn upon the checking accounts of the corporation and of Armour. The facsimile signature plate was under the control of petitioner. While the facsimile signature alone was sufficient to render the corporation's checks negotiable, the banks to which such checks were presented by the bearer usually required his endorsement thereon. Checks drawn upon Armour's personal account at United California Bank during the taxable years here involved at first required either the signature of Armour or the signature of petitioner. Beginning in December 1961, the facsimile signature was sufficient. On October 11, 1960, petitioner prepared *78 or caused to be prepared Check No. 1607 drawn upon the corporation's checking account, payable to the drawee "for cash" in the amount of $2,000, which Armour and he signed and which petitioner cashed and received the proceeds thereof. On October 25, 1960, petitioner signed, endorsed, and cashed a check drawn upon Armour's personal checking account, payable to the drawee "for cash" in the amount of $5,000, which proceeds thereof he personally received. On November 14, 1960, petitioner caused to be prepared Check No. 2366 drawn upon the corporation's checking account, payable to the drawee for "Cash" in the amount of $2,500, which Rathbun and he signed and the proceeds of which he personally received on November 15, 1960. On November 15, 1960, Rathbun and petitioner signed and petitioner cashed or caused to be cashed Check No. 2387 drawn payable to the drawee "for cash" in the amount of $2,500, the proceeds of which he personally received. On January 9, 1961, Rathbun and petitioner signed and on January 11, 1961, petitioner endorsed and cashed Check No. 3356 drawn upon the corporation's checking account, payable to himself in the amount of $150, which proceeds thereof he personally *79 received. On February 1, 1961, Check No. 3781 drawn upon the corporation's checking account payable to the drawee in the amount of $6,403.94, signed by Armour in the upper signatory space thereon and by petitioner thereunder, was cashed by petitioner and the proceeds thereof received by him. Armour and petitioner signed Check No. 5005 dated April 17, 1961, drawn upon the corporation's checking account, payable to the drawee "For Cash" in the amount of $2,500, which check was cashed by petitioner on April 20, 1961, and the proceeds thereof received by him. On or about December 1, 1961, because Everts & Esenoff had merged with the public accounting firm of Peat, Marwick, Mitchell & Company, it was agreed by all interested parties that petitioner should resign from the accounting firm and be employed by the corporation in the same capacity and with the same responsibilities and authority as before. In essence, the change merely involved transferring petitioner from the accounting firm's payroll to that of the corporation. Armour and the petitioner signed Check No. 9814 dated December 8, 1961, drawn on the corporation's checking account, payable to petitioner in the amount of $100, *80 which he endorsed and cashed on December 14, 1961, receiving the proceeds thereof. On December 11, 1961, Armour and petitioner signed and petitioner cashed Check No. 9944 drawn upon the corporation's 1172 checking account, payable to the drawee proceeds were received by petitioner. On February 26, 1962, Check No. 11882 drawn upon the corporation's checking account, payable to the drawee "For Cash" in the amount of $500 and bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof received by him. On May 31, 1962, Check No. 14142 drawn upon the corporation's checking account, payable to the drawee "For 8cash" in 3h5 amount of $500 and bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof received by him. On June 25, 1962, Check No. 1200 drawn upon Armour's personal checking account, payable to the drawee "For Cash" in the amount of $2,500, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof received by him. On September 6, 1962, Check No. 1348 drawn upon Armour's personal checking account, payable to the drawee in the *81 amount of $450, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof received by him. On September 28, 1962, Check No. 1393 drawn upon Armour's personal checking account, payable to the drawee "For Cash" in the amount of $250, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof received by him. Check No. 17330 dated October 3, 1962, drawn upon the corporation's checking account, payable to the drawee "For Cash" in the amount of $500, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner on November 4, 1962, and the proceeds thereof received by him. On October 8, 1962, Check No. 17433 drawn upon the corporation's checking account, payable to the drawee "For Cash" in the amount of $250, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof received by him. On November 5, 1962, Check No. 18275 drawn upon the corporation's checking account, payable to the drawee "For Cash" in the amount of $1,000, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner and the proceeds thereof *82 received by him. On December 18, 1962, Check No. 1604 drawn upon Armour's personal checking account, payable to San Diego Trust & Savings Bank in the amount of $15,000, bearing the facsimile signature of Armour, was prepared and delivered by Betty Moss to petitioner at his direction. This check was negotiated by and paid to petitioner on December 19, 1962, and the proceeds thereof received and utilized by petitioner on such date to purchase twenty $1,000 U.S. Treasury Series "E" Bonds in the name and style of "Howard A. Cozad or Ogden B. Armour," or "Ogden B. Armour or Howard A. Cozad." Armour neither authorized nor had knowledge of this transaction at the time. Neither Armour nor his wife ever received any part of these proceeds directly or indirectly. On January 2, 1963, Check No. 1627 drawn upon Armour's personal checking account, payable to San Diego Trust & Savings Bank in the amount of $13,125, bearing the facsimile signature of Armour, was prepared and delivered by Betty Moss to petitioner at his direction. This check was negotiated by and paid to petitioner on January 7, 1963, and the proceeds thereof were received and utilized by petitioner on that date to purchase seventeen *83 $1,000 and $500 U.S. Treasury Series "E" Bonds in the name and style of "Ogden B. Armour or Howard A. Cozad," or "Howard A. Cozad or Ogden B. Armour." Armour neither authorized nor had knowledge of the transaction at the time. Neither Armour nor his wife ever received any part of these proceeds directly or indirectly. At the time he directed Betty Moss to prepare Checks No. 1604 and 1627, petitioner told her that the proceeds thereof were being withdrawn at the direction of Armour to purchase U.S. Treasury Series "E" Bonds in Armour's name as a nest egg, and that these transactions were not to be disclosed to Armour's wife. Armour had neither authorized nor directed these transactions, nor had he made any such statements to petitioner. Until their redemption by petitioner on January 15, 1964, these bonds were under petitioner's control and he refused to disclose to Armour and others their whereabouts. 1173 In early 1963 the petitioner handled the sale of Armour's interests in the Govway Service Station in Phoenix, Arizona. In connection therewith Check No. 3122 dated February 8, 1963, drawn upon the account of Trew & Woodford, Attorneys at Law, at Valley National Bank, *84 Phoenix, Arizona, payable to Armour in the amount of $10,711.28, signed by Wilmot W. Trew, was received in the corporation's office, endorsed by Armour and delivered to petitioner for deposit to Armour's personal account. Instead, petitioner endorsed and cashed this check and received the proceeds thereof personally. In May 1963, Armour's personal checking account at United California Bank had become inactive or dormant by reason of Armour having established his personal checking account at the Bank of La Jolla, California, in which he was a stockholder. At such time the petitioner instructed Betty Moss to prepare a check or checks drawn upon the corporation's checking account in the amount of $15,000 and advised her that these funds were to be utilized by Armour as a secret account. She was cautioned by petitioner to keep the matter confidential and not to disclose it to anyone, particularly Armour's administrative assistant, Dick Gingles, and Armour's wife. In fact, no such instructions were ever given to petitioner by Armour, who was unaware of the transaction. On May 31, 1963, unknown to Armour, petitioner deposited $15,000 of the corporation's funds in Armour's dormant checking *85 account at United California Bank and added his name to the account. He further instructed and arranged for a "will-call statement," which meant no statement of the account would be mailed by the bank. On September 30, 1963, Check No. 30043 dated September 30, 1963, drawn upon the corporation's checking account, payable to petitioner in the amount of $50, bearing the facsimile signature of Armour, was endorsed and cashed by petitioner on November 6, 1963, and the proceeds thereof personally received by him. About October or November 1963, petitioner purchased a Ben Franklin store in Lemay, Missouri. During the early part of December 1963, petitioner advised Armour that he intended to resign his position with the corporation in 30 days. On December 9, 1963, petitioner prepared and cashed Check No. 1999 of the same date drawn upon Armour's personal checking account at United California Bank which petitioner had secretly reactivated through the deposit of corporation funds on May 31, 1963, payable to the drawee in the amount of $5,000, bearing the facsimile signature of Armour. On December 20, 1963, petitioner prepared and cashed Check No. 1969 of even date drawn upon Armour's *86 personal reactivated account, payable to the drawee in the amount of $5,000, bearing the facsimile signature of Armour. The proceeds of Check Nos. 1999 and 1969 were taken by petitioner to his home and kept there. While petitioner was on vacation over the Christmas holidays, Armour learned through a statement made by Betty Moss that his personal checking account at United California Bank had been reactivated by petitioner causing to be deposited therein $15,000 in corporation funds. In contacting the bank it was learned that petitioner had recently made two withdrawals of $5,000 each from the account. After a meeting among Armour, his accountants and his attorneys, it was decided to advise local banks in writing to honor thereafter only those checks of the corporation and of Armour which were hand signed by Armour or his wife. Upon his return from vacation at the end of the Christmas holidays, petitioner was summoned by Armour to Armour's office where there were also present Harry Hargreaves, a director and the secretary-treasurer of the corporation, and John Whiteman, a certified public accountant from Peat, Marwick, Mitchell & Company. When asked about the withdrawals, petitioner *87 indicated that there had been no improper withdrawals. However, upon being advised that a bank teller had identified and connected him to the reactivated account, petitioner admitted possession of the withdrawn funds totalling $10,000. In response to a question as to whether such money cache constituted the only funds taken, petitioner stated that the amount of $10,000 constituted the only funds he had which belonged to the corporation, and that no other money was involved. After leaving the morning meeting, petitioner returned to the offices of the corporation in the afternoon and delivered $10,000 in cash to Armour. Because of apparent defalcations a cash audit relating back to the time petitioner began working at the corporation was 1174 undertaken by John Whiteman, a certified public accountant who was stationed at the offices of the corporation as an auditor in behalf of Peat, Marwick, Mitchell & Company, the accounting firm retained by the corporation. All checks that were issued during such period were examined, as were the personal holdings of Armour. With respect to the disposition of certain items in which Armour held interests, such as the Govway Service Station and *88 the ABC Garden Shop, there was found no evidence of any proceeds therefrom having been entered into any of the records, books or accounts of either the corporation or of Armour. All checks were reviewed with Armour in an effort to trace, verify, and substantiate disposition of the proceeds thereof. During such review, it was determined that a substantial amount of check proceeds had been charged to Armour's personal account, either as a receivable or as a travel expense. It was established during the review that in many instances when the unexplained checks had been prepared and cashed, Armour was not physically present in San Diego, California, but was away in connection with business travel. A list of unexplained checks and withdrawals was prepared and included all of the checks of the corporation and of Armour. It was further determined by the auditor that Armour's personal set of books and records had not been kept and maintained to date, thus requiring reconstruction thereof. In the course of the cash audit there were discovered the two checks negotiated and utilized by petitioner to purchase the thirty-seven $1,000 and the one $500 U.S. Treasury Series "E" Bonds. This discovery *89 prompted a second meeting between Armour and petitioner in January 1964, at which John Whiteman and Harry Hargreaves were also present. Petitioner admitted purchasing the bonds with corporation funds but refused on demand to surrender them or to disclose their location on the ground that they constituted reimbursement for funds which he had personally advanced to the corporation. Petitioner was unable to produce any memoranda or records evidencing the alleged advancements. When advised that it was very possible some action would be taken against him to recover these funds, petitioner stated that in such event he would testify adversely to Armour in a lawsuit then pending in which Armour was being sued for $300,000, which lawsuit thereafter ended in a judgment against Armour for approximately $60,000. On January 15, 1964, petitioner redeemed the bonds purchased by him with corporation funds and kept the proceeds thereof. During 1963 and for several months prior thereto, petitioner paid to Jean Cozad $400 monthly as alimony. As an employee of Everts & Esenoff in the years 1960 and 1961 and of the corporation in 1962 and 1963, petitioner received annual compensation during these *90 two periods of approximately $16,000 and $18,000, respectively. During 1962 and 1963 petitioner purchased stocks totalling approximately $40,000. A closing statement prepared by realtor Ray Ferguson, dated March 4, 1964, shows that petitioner and his former wife sold on that date their jointly owned and former residence at 400 West 42nd Street, Joplin, Missouri. It further shows that after payment of their mortgage loan at Joplin Federal Savings & Loan Association, as well as expenses attendant to the sale, including the realtor's commission, they received $13,423.35 from the sale price of $27,000. In 1964, after leaving California, petitioner purchased six additional Ben Franklin stores in the Midwest. As of July, 1964, he owned seven such stores, one each in Westminster, Colorado; Broomfield, Colorado; Denver, Colorado; Cahokia, Illinois; Lemay, Missouri; and two in Greeley, Colorado. Of the funds used to acquire these stores, more than $100,000 in cash was contributed by petitioner personally, and $226,000 was provided by him through a loan from the Small Business Administration. The Federal income tax returns of petitioner and Jean M. Cozad for the taxable years 1960 and *91 1961 were filed on or before April 15, 1961, and April 15, 1962, respectively. In January 1967, petitioner and respondent executed a written agreement pursuant to the provisions of section 6501(c)(4) of the Internal Revenue Code of 1954, conditioned upon the applicability of section 6501(e), extending the period for the assessment of a deficiency in income tax for the taxable year 1960 to December 31, 1967. This extended date for assessment 1175 was further extended under subsequent written agreements timely executed by the parties on or about October 19, 1967, on or about April 25, 1968, and on or about February 13, 1969, which subsequent agreements consecutively extended the period of limitations for assessment to May 31, 1970. Prior to February 8, 1968, petitioner and respondent executed a written agreement pursuant to the provisions of section 6501 (c)(4) of the Internal Revenue Code of 1954, conditioned upon the applicability of section 6501(e), extending the period for the assessment of a deficiency in income tax for the taxable year 1961 to June 30, 1968. This extended date for assessment was further extended under subsequent *92 written agreements timely executed by said parties on or about April 25, 1968, and on or about February 13, 1969, which subsequent agreements consecutively extended the period of limitations for assessment to May 31, 1970. The statutory notice of deficiency covering respondent's determination of the income tax liabilities of the petitioner for the taxable years 1960 and 1961 was sent to the petitioner by certified mail on February 12, 1970. Petitioner filed his petition herein on April 30, 1970. The gross income reported by petitioner and Jean M. Cozad on their Federal income tax returns for the taxable years 1960 through 1962 is as follows: Gross
Petitioner
Jean
Year
Income
Amount
Amount
1960
$13,645.65
$11,391.35
$2,254.30
1961
15,559.44
14,971.94
587.50
1962
18,574.25
18,574.25
none
Ultimate Findings 1. Petitioner received additional taxable income, which he failed to report on his Federal income tax returns, as follows: Year
Amount
1960
$12,000.00
1961
9,263.94
1962
20,950.00
1963
23,886.28
2. Petitioner omitted from his gross income for each of the years 1960 and 1961 amounts properly includable therein *93 which were in excess of 25 percent of the amounts of gross income reported in his Federal income tax returns for those years. 3. Petitioner did not file false and fraudulent Federal income tax returns for years 1960 through 1963 with intent to evade tax and no part of the underpayment of tax was due to fraud with intent to evade tax. Opinion 1. Burden of proof. The burden of proof with respect to the basic deficiencies determined in respondent's notices of deficiency rests with the petitioner. On the other hand, the burden of proving fraud falls upon the respondent, and he must carry that burden with clear and convincing evidence. These are two separate burdens and must be distinctly kept in mind, for both sides may fail in their respective burdens. Cf. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6, 1955); Emanuel Hollman, 38 T.C. 251 (1962). Petitioner's reliance upon Weir v. Commissioner, 283 F. 2d 675, 679 (C.A. 6, 1960), is misplaced. The opinion in that case did not indicate that it represented a departure from the general rule as to the burden of proof relating to deficiency determinations, and it must be deemed to rest upon its *94 special facts, including the taxpayer's clear and uncontradicted testimony that he had never received any personal benefit from the checks in question. We think the record in the present case contains no such credible evidence. Cf. Foster v. Commissioner, 391 F. 2d 727, 735-6 (C.A. 4, 1968), affirming on this issue a Memorandum Opinion of this Court. 2. Deficiencies - Understatements of taxable income. This issue is solely one of fact. Notwithstanding conscientious efforts by counsel for both parties, we find the evidence offered by petitioner somewhat elusive and unreliable, and at times lacking in credibility. On this record we conclude that the petitioner has failed to carry his burden of proving error in the basic deficiencies. The central issue in this case is who got the check proceeds. Petitioner asserts that he did not misappropriate any of the proceeds he received from the various checks drawn on the bank accounts of the corporation and Armour. It is his position that although he procured the check proceeds, they were procured upon the explicit instructions of Armour and were given to him. Armour denied that he received the check proceeds from petitioner. *95 Thus the petitioner says the Court must decide whether he or Armour is telling the truth. We are inclined to believe Armour. We regard petitioner's testimony as vague, 1176 general, contradictory and self-serving. In some respects it is inherently incredible. We have difficulty believing petitioner's testimony (1) that he had a net worth accumulation of more than $100,000 on December 31, 1963, when his employment as controller of Armour Management Corporation terminated; (2) that he had $50,000 in cash in an unlocked gray tin box (Exhibit 56), which he carried in his automobile from Missouri to California and later kept in a bedroom closet; (3) that he secretly advanced his personal funds to Armour when the financial condition of the corporation would not permit further withdrawals by Armour; (4) that he had "built up" one of Armour's personal bank accounts with corporation funds in order to create a reserve for income tax money for Armour; and (5) that he withdrew $28,125 from the corporation's account to purchase United States Series E bonds to reimburse himself for alleged advances he had previously made to the corporation. Viewing the record as a whole, the petitioner has *96 failed to persuade us that he did not receive and retain the check proceeds belonging to the corporation and to Armour. That the check proceeds were received and retained by petitioner and were used for his personal benefit is indicated by (1) his unrestricted access to funds of the corporation and of Armour; (2) his handling of finances involving the corporation and Armour individually; (3) his acquisition of stocks in the amount of at least $40,000; (4) his misappropriation of $15,000 in corporate funds; (5) his unauthorized purchase of Government bonds with corporate funds, redemption thereof and retention of the proceeds; (6) his financial condition as of May 1960, compared to such as of January 1964; and (7) his purchase of seven Ben Franklin stores shortly after his termination by the corporation through personal cash contributions collectively in excess of $100,000, together with funds from a Small Business Administration loan of $226,000. Accordingly, we hold, as set forth in our ultimate findings of fact, that the amounts misappropriated by petitioner from the corporation and from Armour in the taxable years 1960 through 1963 constituted gross income to him under section *97 61(a) of the Code. His failure to report such amounts as gross income resulted in the understatements of taxable income for the years in question. See James v. United States [61-1 USTC 9449], 366 U.S. 213 (1961); Geiger's Estate v. Commissioner, 352 F. 2d 221 (C.A. 8, 1965), affirming a Memorandum Opinion of this Court; and Marvin E. Nerem, 41 T.C. 338 (1963). 3. Fraud. As the facts disclose, petitioner omitted substantial amounts of taxable income from his Federal income tax returns for 1960 through 1963. Respondent urges that proof of such understatements of income is, by itself, sufficient to satisfy his burden of proving fraud. While it is true that consistently large understatements of income may be evidence of fraud (cf. Holland v. United States, 348 U.S. 121 (1954) and Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957)), there are various other aspects of the record in this case which cause us to conclude that fraud has not been established. Some of the usual "badges" of fraudulent intent seem to be missing. At least, after carefully reviewing the whole record of testimony and documents, we are left *98 with such troubling doubts that we cannot find that fraud has been proved by clear and convincing evidence. Certainly for the years 1960 and 1961, which were prior to the James decision, petitioner, like James, by failing to report what was then treated as nontaxable income, "could not, in legal contemplation, have formed the intent necessary to commit tax fraud." See Kahr v. Commissioner, 414 F. 2d 621, 627 (C.A. 2, 1969). And we also have reservations about whether he actually knew that misappropriated funds constituted taxable income in 1962 and 1963. As the Court of Appeals said in Davis v. Commissioner, 184 F. 2d 86, 87 (C.A. 10, 1950): Fraud implies bad faith, intentional wrongdoing and a sinister motive. It is never imputed or presumed and the courts should not sustain findings of fraud upon circumstances which at most create only suspicion. The mere fact that we have sustained the basic deficiencies does not supply proof of fraud by clear and convincing evidence. This is particularly true where such deficiencies have been sustained largely because of a failure by the petitioner to sustain his burden of proof. Drieborg v. Commissioner, supra. *99 Accordingly, in view of the 1177 burden of proof, but without strong conviction, we have made an ultimate finding of fact as to the absence of fraud. 4. State of limitations. Petitioner claims that the assessment of any deficiencies for the years 1960 and 1961 is barred by the statute of limitations. Respondent contends otherwise. We agree with respondent. Petitioner and Jean M. Cozad timely filed their joint Federal income tax returns for 1960 and 1961, but the gross income reported thereon, $13,645.65 and $15,559.44, respectively, did not include the funds misappropriated by petitioner in such years in the respective amounts of $12,000 and $9,263.94, which were properly includable in gross income. These omitted amounts are in excess of 25 percent of the gross income reported in the returns for 1960 and 1961. Thus, as provided by section 6501(e) (1) of the Code, the period of limitation for each of the taxable years 1960 and 1961 extended to April 15, 1967 and April 15, 1968, respectively. On January 9, 1967, prior to the expiration of the six-year limitation period, petitioner consented in writing to the extension to December 31, 1967, of the period of limitation for the *100 taxable year 1960. Further written consents were executed by petitioner on October 13, 1967, April 16, 1968, and February 8, 1969, consecutively extending the period of limitation for assessment to May 31, 1970. Also, on January 30, 1968, petitioner consented in writing to the extension to June 30, 1968, of the period of limitation for the taxable year 1961. Additional written consents were executed by petitioner on April 16, 1968, and February 8, 1969, consecutively extending said period of limitation for assessment to May 31, 1970. Respondent's notice of deficiency for both 1960 and 1961 was mailed to petitioner on February 12, 1970. It therefore follows that the assessment of the deficiencies for those years is not barred by the statute of limitations. See Gustave C. Gennert, 9 T.C. 1099, 1103 (1947). To reflect the conclusions reached herein and the concession made by the petitioner, Decision will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩