UNITED STATES of America, Appellee,

v.

Oscar PORCELLI, Appellant.

Nos. 813, 814, Dockets 87–1440, 87–1451.

United States Court of Appeals,
Second Circuit.

Argued Feb. 29, 1988.

Decided Jan. 11, 1989.

Vivian Shevitz, New York City (Jane Simkin Smith, Steven A. Rosen, of counsel), for appellant.

Steven Gold, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Emily Berger, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES and NEWMAN, Circuit Judges, and KEENAN, District Judge.*

OAKES, Chief Judge:

Oscar Porcelli appeals a conviction on sixty-one counts of mail fraud, 18 U.S.C. § 1341 (1982), and one count of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (1982). These acts all relate to the filing of a series of—some one hundred—fraudulent New York State sales tax returns with respect to sales at twelve retail gasoline stations owned in whole or in part by Porcelli or one of his corporations. After a jury trial before Charles P. Sifton, Judge, in the United States District Court for the Eastern District of New York, resulting in the convictions, the jury also returned a verdict of forfeiture of $4,755,000 representing the unpaid sales taxes as well as of thirty-four of Porcelli's corporations to the United States. Porcelli was sentenced to concurrent two-year terms on each of the sixty-two counts, with the execution of all but six months suspended, and was placed on probation for a period of five years. He was ordered to make restitution to the State of New York in the amount of $4,755,000 less any sums collected by the State pursuant to the judgment of forfeiture in this case or any civil tax proceeding.

Following the forfeiture verdict, Judge Sifton entered a judgment of forfeiture which directs that Porcelli forfeit the sum of $4,755,000 and his interest in thirty-four corporations to the United States. The moneys or proceeds from the properties seized are to be paid to the State of New York up to the amount of all unpaid sales taxes, interest, and civil penalties and then to the United States up to an amount equal to twice the amount of sales tax and interest paid to the State of New York. Judge Sifton also denied Porcelli's motion for a new trial on grounds of ineffective assistance of counsel.

On appeal Porcelli argues that use of the mail fraud statute violated due process, that proof of mail fraud was legally insufficient in terms of proof as to specific criminal intent and in terms of proof as to "mailings"; that the mail fraud statute does not encompass tax violations; that the Government's use of RICO to prosecute Porcelli for state sales tax underpayments violates the intent of Congress; that the RICO conviction should be reversed because there was no evidence that the enterprise charged in the indictment was conducted through racketeering activity; that the forfeitures are supported by insufficient evidence and are tainted by erroneous instructions and ambiguous special interrogatories to the jury; that the forfeitures should be reversed because they are cruel, unusual, and grossly disproportionate to the misdeeds of the retail gasoline companies involved; and that appellant was denied the effective assistance of counsel.

We think that the prosecution of a state sales tax evader for a RICO violation pushes that law to its outer limits, especially when that tax evasion was not made criminal by the state itself at the time that the fraudulent returns were filed. We nevertheless affirm the convictions (except for six counts involving only the mailing of blank forms by the State *to* Porcelli's companies) by virtue of the extraordinarily broad sweep of RICO and of the federal mail fraud statute and despite *McNally v.*

---

* Of the United States District Court for the South-ern District of New York, sitting by designation.

*United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We believe, however, following *United States v. Horak*, 833 F.2d 1235 (7th Cir.1987), that the forfeitures were overly broad because they included corporations as to which the Government did not prove any direct receipts from the fraudulent gas station corporations, and we think that the trial judge must reconsider the defendant's claim that the forfeitures were disproportionate. We do not think that Porcelli satisfies either prong of the test of ineffective counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore we affirm the convictions and the denial of a new trial, but we reverse the order relating to forfeiture and remand for further findings.

## FACTS

Viewing the evidence most favorably to the Government, twelve of defendant's retail gasoline stations filed false sales tax returns between 1978 and 1982, enabling them to omit to pay approximately $4,755,000 in state sales tax. This represented two-thirds of the $6.7 million in taxes the stations owed on sales during that period.

Porcelli first entered the retail gasoline business in 1973 in partnership with one Jimmy Garcias Sorentino. From then to 1979, the two men purchased and operated a chain of retail service stations which by 1979 had grown to fourteen in number. As of June 1, 1979, they terminated their partnership and each continued to operate seven of the stations. Each retail gasoline station was organized as a separate corporation, and we will call them the operating corporations. The real estate underlying each station was separately held by what we will call the realty corporations. Porcelli formed a new management company, Ditmas Oil Associates, Inc. ("Ditmas"). Ditmas was the parent company of the group. It had a gasoline terminal which was used to supply gasoline to the various retail outlets. Porcelli also formed a trucking company called Chamber Transport, which made deliveries from the Ditmas terminal to the various retail stations, and a security company known as MK Armored Services, which picked up the sales proceeds at the retail stations and brought them to Porcelli's central money room at Ditmas.

In 1982 Porcelli consolidated his holdings, which had increased to seventeen, into two corporations, Gaseteria Oil Corporation, Inc., and Bosbay Service Center, Inc., and ultimately into the one, Gaseteria.

There was testimony, which is supported by New York statutory authority, that retailers must register with the State and obtain a certificate of authority to collect sales taxes, and that the State mails blank sales tax returns to all registered retailers at the beginning of every sales tax quarter. The returns, setting forth the total dollar amount of quarterly sales and the sales taxes due on that amount, are required to be filed by Article 29 of the New York Tax Law (McKinney 1987).

We will return to the New York sales tax law as it pertains to petroleum products in our discussion of *McNally v. United States*. Suffice it to say here that Count One of the indictment lists 143 racketeering acts, numbered 1(a) through 26(h). Some of the racketeering acts involve two mailings—one of a blank return by the State to one of Porcelli's corporations and the second of a fraudulently completed return by a Porcelli corporation to the State. A number of racketeering acts charged relate only to the second type of mailing, and six acts charged cover only the first. The parties stipulated that each of the 143 sales tax returns was mailed as described in the indictment.

A state sales tax auditor, James McGill, audited the tax returns listed in the indictment. He obtained sales data from Porcelli's suppliers reflecting the dollar value of the gasoline they provided to Porcelli's terminal or retail stations and compared that data to the sales declared by Porcelli on the tax returns. In making this comparison, McGill assumed that Porcelli sold gasoline at the same price he paid for it, thus realizing no profits at all. The parties stipulated that the gas stations did in fact sell all

gasoline at a price equal to or greater than that at which it was purchased.

McGill's audit determined that during the last year of Porcelli's partnership with Garcia his corporations reported approximately $3,580,000 in sales, or only 26% of their true sales for the year. This resulted in an underpayment of sales taxes due the State of New York of some $798,000. During the three and a half years following the termination of the partnership with Garcia, i.e., from June of 1979 through 1982, Porcelli's businesses had sales of $69,600,000 but reported only $20,330,000, thereby underpaying taxes due New York State by $3,957,000. Thus the total amount of Porcelli's underpayments was the $4,755,000 previously stated.

At trial Porcelli's accountant, Murray Katz, who prepared most of the tax returns, made it clear that he did so with Porcelli's knowledge and at his urging. He related the conversation he had with Porcelli in 1979 when he realized that the oil companies supplying Porcelli generated printed summaries of their sales which, if revealed to the State tax authorities, would reveal the Porcelli operating companies' fraud. Porcelli told Katz not to worry because the State tax authorities would never obtain supplier records and compare them to his companies' returns. After Porcelli and Garcia split up, Porcelli and Katz discussed consolidating the Porcelli holdings into one corporation. They decided against doing so because they believed that a single sales tax return for all of the gas stations was more likely to be audited than individual returns filed for each station. In September 1979, Katz attempted to prepare, he testified, an accurate set of sales tax returns; when Porcelli saw the figures he told Katz that it would be impossible for him to stay in business and grow without understating his sales tax liabilities.

While Katz was working for Porcelli, Mobil Oil sued three of the operating companies and sought copies of their sales tax returns in civil discovery. Porcelli directed Katz to prepare a set of dummy tax returns setting forth the true sales volume of the operating companies, and Katz did so. The dummy returns showed substantially greater sales than the amounts shown on the returns actually filed.

There was further evidence of Porcelli's involvement in the tax fraud: He received daily sales reports concerning each station, he set the prices charged for gasoline, and he had monthly summaries of sales in gallons and dollars which were kept in his office, as well as weekly statements of cash balances in corporate bank accounts. He had previously admitted that he had total control over his business, "purchasing, selling, decision making, building, firing, hiring, everything," claiming that he did not delegate authority to, or share decision-making responsibilities with, anyone. When the State started an audit of one of Porcelli's retail stations, "Gasaver," Porcelli, according to Katz, insisted on preparing its returns himself and did so.

By January of 1982, Porcelli had received notices from state authorities that he owed millions of dollars in back sales taxes plus interest and penalties, but he continued to employ and rely upon Katz. Indeed, according to Katz, Porcelli offered him a $200,000 bribe to plead guilty to filing false returns, accept sole responsibility for the sales tax frauds, and falsely exculpate Porcelli. We will discuss further evidence pertaining to Porcelli's RICO enterprise under that topic.

## DISCUSSION

### A. Due Process

■ Porcelli's first argument is that because the State of New York itself did not punish criminally the failure of a vendor to pay over to the State sales taxes collected from a customer, use of the federal mail fraud statute to do so violated due process of the law. Porcelli is correct as far as New York law is concerned. In *People v. Valenza*, 60 N.Y.2d 363, 457 N.E.2d 748, 469 N.Y.S.2d 642 (1983), the Court of Appeals examined the structure of the "[p]enalties and interest" provision, section 1145, of the Tax Law. Certain violations were subject to both criminal and civil penalties, while others, including the failure to remit sales taxes, were subject to civil penalties

only (with one small exception not relevant here). The court therefore held that "the failure to pay over sales taxes may not be considered criminal conduct and is subject to civil penalties only." 60 N.Y.2d at 370, 457 N.E.2d at 750, 469 N.Y.S.2d at 645.

The overall argument that Porcelli had no notice that his conduct was illegal is nevertheless unavailing in light of *United States v. DeFiore,* 720 F.2d 757 (2d Cir. 1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). The defendant there argued that the wire fraud statute should not apply to schemes to defraud the state governments of taxes due. This court followed four other circuits that had squarely applied the federal fraud statutes to state tax law violations. We held that the federal wire fraud statute was applicable to a scheme to defraud the State of New York of cigarette taxes. The court said that the focus of the wire fraud statute "is upon the misuse of the wires, not the regulation of state affairs.... In short, principles of federalism do not provide a basis for reversal." *Id.* 720 F.2d at 761–62 (citations omitted). In so holding, the court distinguished Judge Weinfeld's decision in *United States v. Henderson,* 386 F.Supp. 1048, 1052 (S.D.N.Y.1974), which held that Congress did not intend to apply the mail fraud statute to a scheme to defraud the United States by evading the payment of taxes. *DeFiore* distinguished *Henderson* as involving a federal income tax fraud prosecution and also cited *United States v. Miller,* 545 F.2d 1204, 1216 n. 17 (9th Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977), which rejected *Henderson* in the context of a federal tax violation. *DeFiore,* 720 F.2d at 761.

To be sure, neither *Defiore* nor the cases from the other circuits, *United States v. Melvin,* 544 F.2d 767 (5th Cir.), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977); *United States v. Brewer,* 528 F.2d 492 (4th Cir.1975); *United States v. Mirabile,* 503 F.2d 1065 (8th Cir.1974), *cert. denied,* 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); and *United States v. Flaxman,* 495 F.2d 344 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42

L.Ed.2d 306 (1974), considered the argument that a state's failure to make underpayment of taxes criminal should bar federal prosecution. That does not mean, however, that the broad federal mail fraud statute does not apply, since it punishes "any scheme or artifice to defraud" in which the jurisdictional means—the mails—are employed.

Porcelli casts his due process argument in a slightly different way, focusing on the mental element of the offense. He begins with the rule of lenity, that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985) (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed. 2d 493 (1971)). Porcelli refers us to *James v. United States,* 366 U.S. 213, 221–22, 81 S.Ct. 1052, 1056–57, 6 L.Ed.2d 246 (1961), in which the Court reversed a tax evasion conviction for lack of proof of willfulness because the defendant's conduct, according to the contemporaneous judicial gloss, had been proper when it occurred. The argument is that given the "gloss" of the New York sales tax law during the indictment period, Porcelli could not, "in legal contemplation, have formed the intent necessary to commit" fraud. *Kahr v. Commissioner,* 414 F.2d 621, 627 (2d Cir.1969); *see also United States v. Dixon,* 536 F.2d 1388, 1401 (2d Cir.1976) (mail fraud requires specific intent). He also interprets his comments to Katz, that in effect the underpayment was a "loan" from the State, as meaning that he could not have thereby had the specific intent.

The specific intent required under the mail fraud statute is the intent to defraud, *e.g., United States v. Rodolitz,* 786 F.2d 77, 80–81 (2d Cir.), *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986), and not the intent to violate a statute. Porcelli intended to defraud the State. We read Katz's testimony as showing that Porcelli knew full well that he was not simply "borrowing" money from the State. Accordingly, we reject this due process claim.

## B. Mailings by the State

■ Six of the sixty-one counts of mail fraud charged only a mailing of a blank sales tax return from New York State to Porcelli, without the return mailing of a fraudulent return. Porcelli argues that these mailings by the State were not in furtherance of his so-called fraudulent scheme and that those six counts somehow tainted his entire trial. We agree with the first argument, but not with the second. True, this court has gone quite far in holding that routine mailings are sufficient to form the basis for mail fraud convictions. *E.g., United States v. Muni*, 668 F.2d 87, 90 (2d Cir.1981); *United States v. Reed*, 639 F.2d 896, 906 (2d Cir.1981). Under *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), use of the mails need not be an essential element of the scheme; rather, mailings are in furtherance of a fraudulent scheme if they are "incident to an essential part of the scheme." *Cf. United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (finding use of mails not sufficiently closely related to respondent's scheme to support mail fraud conviction).

The use of forms mailed by the State was a necessary part of Porcelli's scheme. However, the mailing of a form by the State, and nothing more, is not sufficiently closely related to his scheme to support a separate mail fraud count. *United States v. Freitag*, 768 F.2d 240 (8th Cir.1985), and *United States v. Bosby*, 675 F.2d 1174 (11th Cir.1982), are distinguishable in that they involved personalized checks that the defendants caused to be mailed and that were essential to their schemes. Thus we reverse as to mail fraud counts 2, 13, 18, 24, 40, and 51 corresponding to Rackeetering Acts 15(f), 16(f), 18(f), 19(f), 21(f), and 24(d).

■ These reversals do not disturb Porcelli's other convictions. It was not prejudicial to include the mailings by the State in the other counts where there were returned fraudulent mailings. We perceive no prejudicial spillover from the inclusion of the six racketeering acts as to which we reverse or from those mail fraud counts

themselves. *See United States v. Cody*, 722 F.2d 1052, 1060–61 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); *United States v. Ivic*, 700 F.2d 51, 65 (2d Cir.1983).

## C. *McNally*

Porcelli's next argument is more persuasive. He asserts that the Supreme Court in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), indicated that Congress did not intend the mail fraud statute to apply to the tax violations here. *McNally*, it will be recalled, held that the mail fraud statute, 18 U.S.C. § 1341 (1982), is limited to the protection of property rights and that the citizen's right to honest government is not such a property right. It follows, then, that the statute protects only a state's interest as "property holder." 483 U.S. at —— n. 8, 107 S.Ct. at 2881 n. 8. Moreover, the Court said that "if state law expressly permitted or did not forbid [the conduct] it would take a much clearer indication than the mail fraud statute evidences to convince us that [the conduct] defrauds the State and is forbidden under federal law." *Id.* at —— n. 9, 107 S.Ct. at 2882 n. 9. The argument achieves an even greater level of sophistication when one recalls the words of *McNally*:

> As the Court long ago stated, however, the words "to defraud" commonly refer to "wrongdoing one in his property rights by dishonest methods or schemes" and "usually signify the *deprivation* of something of value by trick, deceit, chicane, or overreaching."

483 U.S. at ——, 107 S.Ct. at 2880 (emphasis added) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). The concept of deprivation means obtaining property with an intent not to pay as opposed to mere failure to pay. The question then becomes whether Porcelli intended to deprive New York of its property.

■ Intangible interests have long been recognized and protected as property. *E.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815

(1984) (trade secrets); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (long term lease). Any suggestion that *McNally* might exclude all intangible interest from the scope of section 1341 (or its wire fraud companion, section 1343) was dispelled by *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (holding that confidential business information is "property" protected by the mail and wire fraud statutes). Thus the fact that New York's interest in unpaid sales taxes is intangible is no obstacle to a mail fraud prosecution. In fact, Porcelli, as he knew he was doing, obtained cash, and this is true whether or not he actually collected the sales tax on his gasoline sales. If he did not collect the tax, then he obtained funds that an honest retailer, selling for the same price, would have remitted to the State. If he did collect the tax (as would have been proven if there had been evidence that it was posted on signs) but failed to remit, then, of course, he obtained money and surely deprived the State. In any event, New York State lost money as a result of Porcelli's schemes, that is to say, lost the sales tax proceeds due from his sales of gasoline even though it maintains a civil right, or chose in action, to obtain those proceeds.[1]

■ Under *McNally*, then, Porcelli gained something tangible and New York State's interests as a property holder were implicated. But did Porcelli *deprive* New York of its property? The answer to this question would be easy if Porcelli actually collected the tax on his sales. *See* N.Y.Tax Law § 1132(a) (McKinney 1987) ("tax shall be paid to the person required to collect it as trustee for and on account of the state"). However, the Government did not prove actual collection of the tax. We turn to New York law to determine whether a vendor's failure both to collect and to remit

sales taxes deprives the State of its property.

One derives from the New York case law that sales taxes are just that—a tax obligation—and not ordinary debt. The case law also indicates that the statutory provisions for proceedings to recover unpaid sales taxes define the State's property interest here as choses in action. In *In re Rockaway Paint Centre, Inc.*, 249 A.D. 66, 291 N.Y.S. 341 (1936), the court in reference to the New York City sales tax there involved said that "the tax is imposed not on the vendor or the purchaser, but 'upon receipt from sales.'" 249 A.D. at 68, 291 N.Y.S. at 344 (quoting local tax law). Here also the sales tax is imposed upon "[t]he receipts from every retail sale of tangible personal property." N.Y.Tax Law § 1105(a) (McKinney 1987). The *Rockaway* court went on to say:

> True, the obligation to pay the tax is placed in the first instance upon the purchaser, but a concurrent obligation is placed upon the vendor to collect it, and, whether he does or does not collect it, a direct and independent obligation is cast upon the vendor to pay it to the city. Once the purchaser pays the tax, whether to the vendor or directly to the city, he is discharged from liability. But until the receipt of the tax by the city, the vendor remains liable for it. The fact that in the event of non-payment the city has a right to proceed against the purchaser does not diminish the liability of the vendor or change the character of his obligation from that of a tax to a debt.

249 A.D. at 68–69, 291 N.Y.S. at 344. So, too, did Porcelli have "a direct and independent obligation" to pay the State the sales taxes due, an obligation which by virtue of his fraudulent scheme the State did not even know about.

Further, the New York tax law here involved states that "[e]very person required to collect the tax shall collect the

---

1. The dissent characterizes Porcelli's behavior in purely negative terms: He failed to collect the sales taxes, and then he simply failed to pay a debt. We see more than just omissions to act in this case. There is a pattern of action stretching over a considerable period of time. Porcelli systematically underpaid his sales taxes and concealed what he was doing. A vendor may undertake to defraud the State by failing to collect sales taxes and then pocketing the money that he owes in taxes. This is quite different from "simply ... failing to pay [a] debt."

tax from the customer when collecting the price ... to which it applies.... The tax shall be paid to the person required to collect it as trustee for and on account of the state." N.Y.Tax Law § 1132(a) (McKinney 1987). It also provides that the "amount so payable to the tax commission for the period for which a return is required to be filed shall be due and payable to the tax commission on the date limited for the filing of the return for such period, without regard to whether a return is filed or whether the return which is filed correctly shows the amount of receipts ... or the value of property or services sold or purchased or the taxes due thereon." *Id.* § 1137(e)(1). In reference to the analogous New York City sales tax law which declared that the tax "shall be paid by the purchaser to the vendor as trustee for and on account of the city and the vendor shall be liable for the collection thereof and for the tax," the New York Court of Appeals held that

> [w]hile the incidence of the tax is, in the first instance, placed on the consumer, this court has flatly held that "vendors ... are to be deemed taxpayers under this legislation," *Fifth Ave. Building Co. v. Joseph*, 297 N.Y. 278, 283, 79 N.E.2d 22, 24 [ (1948) ], that "the obligation imposed upon the vendor is in the nature of a tax" which is "not measured by the amount collected nor dependent upon failure to exercise the diligence in collection which would be required of an agent." *Matter of Atlas Television Co.*, 273 N.Y. 51, 57–58, 6 N.E.2d 94, 96 [ (1936) ].

*W.T. Grant Co. v. Joseph*, 2 N.Y.2d 196, 203, 140 N.E.2d 244, 247–48, 159 N.Y.S.2d 150, 154 (1957). The *W.T. Grant Co.*, court stated that it was a "necessary corollary that one measure of the vendor's obligation as a taxpayer is the tax which his customers were required to pay on individual sales, and that obligation may not be discharged by payment of any lesser amount, irrespective of the vendor's exercise of reasonable diligence in collection." 2 N.Y.2d at 203, 140 N.E.2d at 248, 159 N.Y.S.2d at 154. The court then went on to quote *Merchants Refrigerating Co. v. Taylor*, 275 N.Y. 113, 124, 9 N.E.2d 799, 803 (1937), for the proposition that the vendor is " 'under a duty to pay the tax ... regardless of whether or not ... [he] collects it from the purchaser.' " 2 N.Y.2d at 203, 140 N.E.2d at 248, 159 N.Y.S.2d at 154–55.

We do not think that Porcelli was in any different situation vis-a-vis the State here. He was obliged to pay the tax whether or not he collected it from the customers. By virtue of his scheme to defraud, i.e., the false sales tax returns, he was in a very real sense "depriving" the State of its property. The fact that the State has a claim, a chose in action, for the difference between what was paid and the tax shown on the false return may mean that it has not finally been deprived of that chose in action. However, the fact remains that until the fraud was discovered it had been deprived of its property.

█ Porcelli's conduct, in short, was aimed at depriving the State of its property, the choses in action represented generally in the state tax law as above stated, and specifically in the state tax law providing for an action at law and authorizing the tax commissioner to issue a warrant and to obtain a lien upon the property of the person failing to pay the tax. N.Y.Tax Law § 1141(a)–(b) (McKinney 1987).[2]

Nothing in *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988), is to the contrary. There, Judge Posner's opinion followed

---

**2.** This is not, as suggested by the dissent, an alternative theory upon which to uphold Porcelli's conviction. Our analysis shows, first, that New York had a property interest, which we label a chose in action, in Porcelli's tax obligations. We then show that Porcelli deprived New York of that property when he carried out a scheme (in the words of the indictment and the jury charge) "to defraud the State of New York ... of sales tax due on the retail sale of gasoline by underreporting the gross sales, taxable sales, and sales tax due." Thus, Porcelli's indictment and the charge to his jury remain satisfactory; they required proof that he knowingly and willfully defrauded the State of money due from sales taxes. Proof of that was proof that he intentionally deprived the State of its property, in violation of the mail fraud statute as construed by *McNally*.

*McNally* and distinguished *Carpenter* in reversing the mail fraud conviction of an Illinois state trial judge for taking bribes from lawyers with cases before him or from persons who sought appointment as receivers. Indeed, in dictum Judge Posner advances very much the same proposition we rely upon here: *McNally* would not apply to a corrupt public official who, having received bribes, takes steps to conceal them in order to defeat his public employer's right to obtain them by means of a suit based on constructive trust principles. *See Holzer,* 840 F.2d at 1348.

### D.   Enterprise

Porcelli argues that the evidence at trial did not prove the extensive enterprise alleged in the indictment. The failure to satisfy *United States v. Huber,* 603 F.2d 387 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), and the material variance between the indictment and the proof require, he claims, a reversal of the RICO conviction.

■ The "enterprise" is a separate element that must be proven in a RICO action. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). The statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1982). This broad definition makes sense when applied to uses of the word in subsections 1962(a) and (b). The enterprise can be *any* enterprise, not necessarily one engaged in a pattern of racketeering; indeed, it may be a victim of racketeering. This is consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime. *See* Lynch, *RICO: The Crime of Being a Criminal,* 87 Colum.L.Rev. 661, 677–80 (1987).

In some situations, however, the "enterprise" is more narrowly defined. The enterprise itself may be the villain, conducting its affairs through a pattern of racketeering. This sort of enterprise falls within the scope of subsection 1962(c). *See*

*Turkette, supra* (term "enterprise" as used in RICO encompasses both legitimate and illegitimate enterprises).

Differences among RICO enterprises are apparent in the case law, although courts do not always articulate the distinction. For example, in *United States v. Zang,* 703 F.2d 1186, 1194 (10th Cir.1982), *cert. denied,* 464 U.S. 828, 104 S.Ct. 103, 78 L.Ed.2d 107 (1983), an "ongoing association for the purpose of engaging in interstate commerce" satisfied RICO's "enterprise" element. The enterprise in this case was a partnership between the two racketeer defendants. However, as the court's treatment of the forfeiture issue demonstrated, the affairs of that enterprise were not conducted through a pattern of racketeering. *See id.* at 1195. In *United States v. McNary,* 620 F.2d 621, 628–29 (7th Cir. 1980), the court upheld a conviction under section 1962(a) where the defendant had invested money obtained through bribery and extortion in a family-owned travel agency, an enterprise engaged in interstate commerce.

In many cases, of course, the enterprise itself is the vehicle for the racketeering activity. For example, in *Huber* an interlocking group of corporations constituted a fraudulent enterprise that supplied hospital and surgical equipment. 603 F.2d at 393–95. In *United States v. Mazzei,* 700 F.2d 85, 91 (2d Cir.), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), the enterprise was a group of players and bettors who joined together to influence the outcome of college basketball games in a point-shaving scheme.

These distinctions among RICO enterprises become important in case of forfeiture under section 1963(a). Courts that hold that a "RICO enterprise" is forfeitable in its entirety refer to enterprises whose affairs are conducted through a pattern of racketeering, in violation of section 1962(c). *E.g., United States v. Walsh,* 700 F.2d 846 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *Huber.* The statute also requires the forfeiture of an "interest" outside the racketeering RICO enterprise—e.g., an investment in a

legitimate business made with tainted funds or an interest that gives one influence over a racketeering enterprise. 18 U.S.C. § 1963(a)(1), (2)(D), (3) (Supp. IV 1986). *See Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (discussion of section 1963(a)(1)). In these cases, however, it is not the entire enterprise that is forfeited but the property interests in that enterprise that are derived from racketeering activity or that are a source of influence over a racketeering enterprise. Courts therefore limit forfeitures outside the racketeering enterprise. *E.g., Zang,* 703 F.2d at 1195; *Horak,* 833 F.2d at 1243 (forfeiture under § 1963(a)(1) limited to interests that would not have been acquired or maintained "but for" defendant's racketeering activities); *cf. United States v. McKeithen,* 822 F.2d 310, 314–15 (2d Cir.1987) (requiring proportional forfeiture of property that is source of influence under Continuing Criminal Enterprise statute, 21 U.S.C. § 848(a)(2), and noting similarity of continuing criminal enterprise statute's forfeiture provision to § 1963(a)(2)).

■ These distinctions should be borne in mind when we refer to the term "enterprise." For clarity here, we refer to a "RICO enterprise" to mean a *racketeering* enterprise within the meaning of section 1962(c). An important issue in this case is the extent of Porcelli's RICO enterprise. There can be no serious dispute that the twelve operating companies were, collectively, a RICO enterprise. But what about the realty companies? What about Ditmas, the management company? What about the trucking and security companies?

The Supreme Court has commented that an enterprise may be "a group of persons associated together for a common purpose of engaging in a course of conduct." The existence of the enterprise may be proven with evidence of an "ongoing organization" in which its associates "function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. *See also United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982) (elements of "enterprise" are "common or shared purpose," "continuity of structure and personnel," and "ascertainable struc-

ture distinct from that inherent in the conduct of a pattern of racketeering"), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *GLM Corp. v. Klein,* 665 F.Supp. 283, 289 (S.D.N.Y.1987) (complaint sufficiently alleged RICO enterprise where it claimed that individuals "functioned as a continuing group with a common purpose to divert corporate opportunities ... by improper means").

This court's decision in *Huber* shows the correct approach to defining the RICO enterprise in Porcelli's case. *Huber* involved a multicorporate hospital supply business which had defrauded the United States through Medicare, Medicaid, and Hill–Burton hospital programs. Huber owned seven corporations, all of which were in the business of supplying hospital and surgical supplies, furniture, and equipment. *Id.* at 390–92. The court held that common ownership of the corporations was, in itself, an insufficient association to create a RICO enterprise. *Id.* at 394. However, the evidence showed that transfers of funds among Huber's companies could "represent[ ] funds derived from the scheme to defraud." Each of the companies was involved in the fraudulent hospital supply operation; they were not "merely unrelated businesses owned by the same person." The court concluded that Huber's seven corporations were "a single business operated under various names and forms chosen by appellant to suit his own purposes and convenience." *Id.* at 395. They were the RICO enterprise that was subject to forfeiture. *Id.* at 390–91.

The *Huber* court distinguished *United States v. Nerone,* 563 F.2d 836 (7th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), where an illegal gambling operation in one mobile home had "nothing to do with the affairs of the trailer park" where that home was located. *Huber,* 603 F.2d at 395. The count also warned against "undue prosecutorial zeal in invoking RICO." *Id.* at 396. *See also Horak,* 833 F.2d at 1251 ("prosecutorial caprice in the choice of the enterprise" could implicate the Eighth Amendment).

The evidence in Porcelli's case shows the existence of a RICO enterprise extending *beyond* the twelve operating companies that underpaid their sales taxes. Those operating companies occupied land that was owned or leased by separate realty companies. Without that real estate, obviously, the operating companies could not have operated. In addition, Ditmas was the keystone in Porcelli's racketeering arch. There was evidence that Ditmas was the parent of the retail gas stations. Porcelli, his accountant, and his management staff had offices at Ditmas where they kept the books and records of the operating companies. Ditmas also operated a wholesale gasoline terminal which supplied the retail stations with gasoline. By channeling all of his wholesale purchases through Ditmas, Porcelli could conceal the volume of sales at individual stations and thus the extent of his underpayment of sales taxes.

We conclude, therefore, that the evidence is sufficient to prove a RICO enterprise consisting of the twelve operating companies that underpaid their sales taxes, the realty companies that owned or leased those operating companies' land and Ditmas Oil Associates, Inc., the management company. It was incorrect, however, to include in the RICO enterprise four other operating companies that were acquired with funds from the twelve operating companies but that did *not* underpay their sales taxes. Those four companies might well be forfeitable, in whole or in part, but they are not part of Porcelli's RICO enterprise. Nor should realty companies that did not have offending companies on their land be included in the RICO enterprise. Similarly, the trucking and security companies were not part of Porcelli's RICO enterprise. They provided services to the offending retail gasoline companies; but, unlike the realty companies or the management company, they were not an integral part of Porcelli's fraudulent scheme.

The variance between the charged enterprise and the proof did not prejudice Porcelli and does not warrant reversal of his RICO conviction. Porcelli's defense to the RICO charge against all of the corporations specified in the indictment necessarily included his defense against an identical RICO charge against the twelve offending operating companies, the realty companies, and the management company. *See United States v. Ianniello*, 808 F.2d 184, 189 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987); *United States v. Heimann*, 705 F.2d 662, 666–68 (2d Cir.1983), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2178, 80 L.Ed.2d 560 (1984); *United States v. Sindona*, 636 F.2d 792, 798–99 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981).

### E. Forfeiture

The jury found $4,755,000 and thirty-four separate corporations forfeitable to the federal government. On the basis of these findings, the district judge declared the moneys and properties forfeited to the United States with the limitations previously indicated. The thirty-four forfeited corporations included the twelve offending gasoline retail companies, as well as Ditmas Oil Associates, Inc., several realty corporations, the MK Armored Services Corporation, and Chamber Transport, Inc. Among the realty corporations, some owned the land on which gasoline station operators were located and some did not; some owned land both of offending and nonoffending retail corporations.

Porcelli challenges this forfeiture on a number of grounds—statutory, evidentiary, equitable, proportional, and constitutional.

A RICO enterprise found in violation of section 1962(c) is indivisible and is forfeitable in its entirety. *United States v. Anderson*, 782 F.2d 908, 917–18 (11th Cir. 1986); *Walsh*, 700 F.2d at 857; *Huber*, 603 F.2d at 397; *see* § 1963(a)(2)(A)–(C). The Eighth Amendment may limit the forfeiture where the enterprise is "substantially engaged in legitimate business." *Walsh*, 700 F.2d at 857.

In addition to forfeiting the RICO enterprise, the convicted racketeer must forfeit certain property interests outside the RICO enterprise. These include an "interest" acquired or maintained through a pattern of racketeering activity. § 1963(a)(1). The

racketeer also forfeits any property or contractual rights that give him influence over the RICO enterprise. § 1963(a)(2)(D). And, as noted above, these forfeitures are subject to limitations. *See Horak*, 833 F.2d at 1243 ("but for" test); *cf. McKeithen*, 822 F.2d at 315 (proportionality under analogous forfeiture provision of CCE). The Congressional aim guiding these forfeitures is to recover all of the racketeer's ill-gotten gains but not to seize legitimately acquired property.

■ Porcelli must forfeit his RICO enterprise. If the enterprise had been too broadly defined, he could legitimately challenge this forfeiture. However, the enterprise as we have defined it was deeply implicated in Porcelli's fraudulent scheme. The judgment forfeiting the twelve operating companies, the realty companies associated with those companies, and Ditmas Oil Associates is therefore appropriate under section 1963(a)(2)(A).

■ In addition, Porcelli must forfeit certain interests outside his RICO enterprise. There is evidence of substantial transfers of money between Porcelli's various corporations. Porcelli portrays these as no more than arm's-length business dealings—the payment of rent, purchases of supplies, etc. They are, in fact, more than that. Funds derived from the operation of the RICO enterprise were proceeds obtained from racketeering activities. When Porcelli used his tainted profits to buy new properties, he acquired interests that were forfeitable under section 1963(a)(1). *See Russello*, 464 U.S. at 22, 104 S.Ct. at 300 (proceeds of fraud forfeitable).

Through the testimony of Katz and with documentary evidence, the Government proved that money from Porcelli's operating companies helped to finance his expansion. Frequently, funds were channeled through Ditmas, the management company; sometimes, money from the operating companies went directly to the realty companies that purchased new properties. The evidence showed that the following properties were acquired by means of extraordinary payments from the operating companies:

1. property on Coney Island
2. the Claudan Auto Center
3. the Terraneous gas station
4. the Ditmas oil terminal
5. Chambers Transport, Inc.
6. property at 2910 Northern Boulevard in Queens
7. property at 1153 Atlantic Avenue in Brooklyn
8. property at 15409 Union Turnpike
9. property at 2 West End Avenue

These properties are hence forfeitable under section 1963(a)(1) to the extent of the contribution from the offending companies, but not necessarily in their entirety. *See Horak*, 833 F.2d at 1241–44; *Zang*, 703 F.2d at 1195. There is also evidence that Porcelli's business expanded and prospered as a result of his hard work and business acumen. In other words, these properties are not entirely the tainted fruits of Porcelli's fraud. The court below erred in not determining the extent of Porcelli's interest in these properties that he would not have acquired or maintained but for his fraudulent scheme. *See Horak, supra*. Similarly, forfeiture under section 1963(a)(2)(D) (regarding sources of influence over the RICO enterprise) must be limited by *McKeithen*'s rule of proportionality. This is a matter for reconsideration by the district court on remand.

■ Porcelli makes numerous other arguments as to the impropriety of the forfeiture, but we believe that they are without merit. As to the cash forfeiture verdict, he claims that instead of multiplying the value of the gasoline sold by the sales tax rate of 8%, as the Government expert, the New York state tax auditor, testified, the jury should have divided it by 1.08. But the expert started from wholesale prices which did not include sales taxes and multiplied those prices by 8% to calculate the amount of sales tax a retailer should have added to his wholesale prices. This was in accord with the New York case of *W.T. Grant Co. v. Joseph*, 2 N.Y.2d at 204, 140 N.E.2d at 248, 159 N.Y.S.2d at 144 (vendor is "liable ... for the taxes which should have been

paid by his purchasers (or the amount of taxes actually collected, if that be greater)").

Porcelli's next argument is that if there were proceeds from underreported taxable sales, they were either obtained by the defendant himself, as to which there is nothing in the record, or retained by the businesses he owned. Forfeiture of both money and businesses under a "proceeds" theory is thus contrary to fact and violates double jeopardy. We agree with the Government that this ignores the terms and conditions of Judge Sifton's order insofar as it returns to Porcelli any excess moneys remaining after the prescribed payments to the State and the United States.

■ Porcelli also argues that he could not have been subject to forfeiture under section 1963(a)(1), because that section was not specified as a basis for forfeiture in the bill of particulars. However, paragraph 35 of the indictment referred to this theory of forfeiture, and the only particulars Porcelli sought or the court required specified the properties subject to forfeiture, not the Government's legal theories. While at trial Porcelli did not object to the special interrogatory tracking the language of section 1963(a)(1), he now argues that the language of that special interrogatory did not sufficiently track the exact language of the statute, which covers interests acquired or maintained "in violation of section 1962." The jury was asked to consider whether Porcelli's interests had been "acquired or maintained through his racketeering activity." This language is drawn from section 1962(b); but subsection 1962(c), the basis of this prosecution, also uses the phrase "through a pattern of racketeering activity." It was not error for the charge to overlap in this way with the language of section 1962(b).

■ Finally, the forfeiture verdict does not constitute unusual punishment. It provides for restitution to the victim—the State of New York—in an appropriate amount. By requiring Porcelli to pay the United States twice the amount owed to New York, the forfeiture verdict amounts to triple damages, something rather commonly known first in antitrust cases and now in civil RICO. We do not think that this is disproportionate within *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), or *Huber*. We note, too, that the forfeiture verdict simply deprives Porcelli of the fruits of his crime and that, while he could have been sentenced to up to twenty years in prison, 18 U.S.C. § 1963(a), his prison term runs only two years.

■ Porcelli's arguments pertaining to inadequacy of trial counsel under *Strickland v. Washington*, 466 U.S. at 687–90, 104 S.Ct. at 2064–66, are simply unavailing. Porcelli was represented at trial by Jay Goldberg, a well-known, experienced criminal lawyer, with assistance by Professor Steven A. Reiss, a former United States Supreme Court law clerk and a professor of law at New York University School of Law, and Edward M. Chikofsky, a former federal district court law clerk and adjunct professor at Fordham University Law School who was prevailing counsel in a recent significant RICO attorneys' fees forfeiture case, *United States v. Monsanto*, 852 F.2d 1400 (2d Cir.1988) (en banc), *cert. granted*, ─── U.S. ───, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988). It is plain from the record that a considered decision was made by able counsel to seek to convince the jury that the charged mailings were not sufficiently in furtherance of Porcelli's frauds to sustain the mail fraud charges. The defense also sought to portray this as an overzealous, unfair prosecution more properly brought in state court. They chose not to distinguish between offending corporations and nonoffending corporations and to make arguments based upon proportionality as in *McKeithen* or to advance some of the other arguments made on appeal relative to forfeiture, for the obvious reason that this would have amounted to a concession that Porcelli's racketeering profits in the gasoline station corporations which did file false returns would have to be forfeited.

Judgment of conviction of all counts except counts 2, 13, 18, 24, 40, and 51 affirmed; judgment of forfeiture reversed

and remanded for further proceedings consistent with this opinion.

JON O. NEWMAN, Circuit Judge, dissenting:

Oscar Porcelli owes the State of New York nearly $5 million in state sales taxes that he failed to collect from his retail gasoline customers. New York is entitled to sue him civilly for those taxes and to collect penalties and interest. N.Y.Tax Law § 1145 (McKinney 1987). New York can also prosecute him criminally for the misdemeanor of willfully failing to collect sales taxes from a customer. N.Y.Tax Law § 1145(b) (McKinney 1966).[1] But New York has not pursued either of its state law remedies. Instead, the United States has charged Porcelli under federal mail fraud and racketeering statutes and has obtained a felony conviction that sends him to jail for six months and requires him to forfeit his property in an amount equal to three times the unpaid sales taxes. Before tolerating such an extraordinary disparity between federal and state enforcement techniques, especially as to a matter so central to the prerogatives of states as the collection of their own taxes, courts should be scrupulous in making sure that the conduct punished under federal authority falls within the reach of federal statutes. In my view, the mail fraud statute, as construed by the Supreme Court in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), does not apply to Porcelli's conduct; moreover, if, as the panel's opinion holds, the statute could apply to Porcelli's conduct on a theory of concealment of a chose in action, his conviction is invalid because this theory was not charged in the indictment nor placed before the jury in the trial judge's charge and therefore, under well-settled law, cannot be the basis for upholding the verdict. I therefore respectfully dissent.

I. The Absence of a Deprivation of the State's Property

Prior to *McNally*, this Circuit and others had held that failure to pay state taxes could establish a scheme to defraud within the meaning of the federal mail and wire fraud statutes. *United States v. DeFiore*, 720 F.2d 757 (2d Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984); *United States v. Melvin*, 544 F.2d 767 (5th Cir.), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977); *United States v. Brewer*, 528 F.2d 492 (4th Cir. 1975); *United States v. Mirabile*, 503 F.2d 1065 (8th Cir.1974), *cert. denied*, 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Flaxman*, 495 F.2d 344 (7th Cir.), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). *McNally* requires us to reconsider the continued validity of that line of cases.

*McNally* contains two holdings. First, the Court held that fraud within the meaning of the federal mail and wire fraud statutes requires a " 'deprivation' " of another's money or property. 107 S.Ct. at 2881 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). Second, the Court held that "the intangible right of the citizenry to good government" is not property within the meaning of the federal fraud statutes. 107 S.Ct. at 2879.[2] *McNally*'s second holding, concerning the intangible right to honest government, is not implicated by Porcelli's appeal. But the first holding, requiring a deprivation of another's money or property, squarely applies. The deprivation need not be successful, but it must be the object of the scheme to defraud.

The panel majority recognizes that after *McNally* a mail fraud conviction may be upheld only upon proof that the defendant schemed to deprive another of money or

---

**1.** This version of section 1145(b) was in effect at the time of the events in this case. *See* 1965 N.Y.Laws, ch. 93, § 1145(b) (1965) ("any person willfully failing to collect the tax from a customer" is guilty of a misdemeanor). The current version, similarly worded, is N.Y.Tax Law § 1817(c) (McKinney 1987).

**2.** As the Court was subsequently to make clear, some intangible rights, such as an employer's right to maintain the secrecy of its information, are property within the meaning of federal fraud statutes. *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

property. As the majority puts it, and I fully agree, the concept of deprivation means "obtaining property with an intent not to pay as opposed to mere failure to pay." 865 F.2d at 1359. I also agree with the majority's further observation that Porcelli would have deprived the State of its property if it had been shown that he had collected sales taxes and had failed to remit them to the state tax collector.[3] But, as the majority acknowledges, there was no evidence that Porcelli collected even $1 of sales tax.

Moreover, the indictment does not charge him with collecting any sales taxes, nor describe the scheme to defraud as the failure to remit collected taxes. The indictment simply alleges that retail gasoline vendors are "required" to collect sales taxes and that Porcelli's scheme was to defraud the State of "sales taxes due." Though the indictment also alleges a scheme "to obtain monies *from* the State of New York" (emphasis added), there was no evidence that any money moved from New York to Porcelli, nor did the jury charge require the jury to find that this happened. The indictment charged and the proof established only that Porcelli failed to pay the sales taxes that he owed to New York because he had failed to collect them. *See* N.Y.Tax Law § 1137(e)(1) (McKinney 1987).

This distinction between owing uncollected taxes and failing to remit collected taxes is not just a technical matter of pleading and proof; it has significant dollar consequences for Porcelli and New York. New York imposes an 8% sales tax.[4] If the United States (on behalf of New York) had charged Porcelli with collecting but failing to remit the sales tax, and if the evidence had shown that he did collect the tax, the amount of the tax would have been calculated by dividing Porcelli's sales revenue by 1.08 and subtracting the quotient from his sales revenue.[5] Thus, for each dollar of revenue, the tax collected would have been 7.4 cents. In other words, each dollar of revenue would have consisted of 92.6 cents of the sales price of the gasoline plus 7.4 cents (8% of 92.6) of sales tax. However, by charging Porcelli with failing to collect the tax, the Government was able to claim that Porcelli owed New York 8 cents for each dollar of revenue. The Government's use of the 8–cents–per–dollar approach produced a tax debt of $4,755,000, whereas the 7.4–cents–per–dollar approach would have produced a debt of $4,398,000. Thus, by alleging that Porcelli had never collected the sales tax from his customers, the prosecution gained an extra $357,000 for New York and an extra $714,000 for the United States in forfeited property.

The issue of law for us is whether, after *McNally*, a person has deprived a state of its money or property by failing to collect taxes and by failing to pay taxes he owes by reason of his failure to collect them. I believe the answer is "no." Unless and until extracted from Porcelli's customers, the dollars of sales taxes that he should have collected belonged to those customers, not the State of New York. Once Porcelli failed to collect the sales taxes, he became liable for the amount he should have collected, but that amount, in his hands, was still his property, not New York's. He owes New York the amount of sales taxes

---

**3.** The majority suggests that collection of sales taxes by Porcelli from customers would have been proven if there had been evidence that the sales tax amount was posted on signs at the gas pumps. Obviously, this speculation cannot save the conviction because there was no such evidence. Moreover, it is not at all clear that sales taxes are ever reflected on signs at the pump, either in pennies or as a percent of the selling price. The state sales tax is not a gasoline excise tax, the amount of which is sometimes displayed at the pump.

**4.** The exact percentage of the tax varies throughout the state since there is both a state and a local sales tax. For Porcelli's sales, the prosecution used an 8 percent rate.

**5.** This calculation is not only a matter of arithmetic; it was testified to by the prosecution's tax expert, an official of the New York Tax Department. After testifying that the amount of tax should be "backed out" using the calculation in the text if the tax had been collected, the expert then proceeded to calculate Porcelli's tax debt on the assumption that he had not collected the tax: the expert multiplied the prosecution's sales figures by 8 percent.

he should have collected, but a debtor does not deprive his creditor of the creditor's property simply by failing to pay the debt.

It is arguable that Porcelli has deprived New York of his personal share of all the services New York renders to its taxpayers; it is those services that Porcelli has obtained *from* New York by not paying the taxes he owes. But it is highly doubtful that a taxpayer's share of state services is the sort of property that may be the object of a mail fraud scheme after *McNally*. In any event, the indictment did not charge a scheme to defraud New York of a share of state services, and the case was not submitted to the jury on this theory.

What Porcelli has done is fail to pay a debt due the State of New York. Though the mail fraud statute has been given broad application, it has never been interpreted to cover non-payment of debt and may not be so interpreted after *McNally*. Though willful evasion of taxes is commonly referred to as "tax fraud," the failure to collect sales taxes and the failure to pay the tax debt resulting from non-collection is not "fraud" in the common-law sense in which *McNally* uses that term.

## II. The Panel's Theory of Deprivation of Choses in Action

Apparently recognizing that Porcelli may not be said to have deprived New York of its money or property simply because he did not collect sales taxes and did not pay his resulting debt to New York, the panel majority constructs a theory of deprivation of property based on the idea that Porcelli has deprived the state of its "choses in action," its right to sue Porcelli for the amount of taxes he owes. I can readily agree that New York has a claim against Porcelli for the sales taxes that he owes and that this claim may be regarded as a chose in action. Even if this chose in action is "property" within the meaning of that term in *McNally*, it is questionable whether Porcelli has "deprived" New York of such property within the meaning of that term in *McNally* by concealing from New York the amount of the tax debt that he owes. But there is no occasion on this

appeal to decide whether the mail fraud statute could be applied to Porcelli on a theory of depriving New York of its chose in action (as distinguished from its money) because this theory was not charged in the indictment, nor presented to the jury.

*McNally* itself is the most recent authority for the well-settled principle that an uncharged theory cannot be used to salvage a criminal conviction. After invalidating the conviction that had been obtained on the theory that McNally had deprived citizens of their right to honest performance of his duties, the Supreme Court refused to uphold the conviction on an alternative theory, pressed at oral argument, that McNally had obtained property (a share of insurance commissions) by means of false pretenses. The Court pointed out that "there was nothing in the jury charge that required such a finding [of receipt of money by false pretenses]." 107 S.Ct. at 2882. So here, there was nothing in the jury charge that required the jurors to find that Porcelli had deprived New York of its property by concealing a chose in action. The principle that a conviction may not be salvaged by a theory of violation not submitted to the jury has been invoked repeatedly. *E.g., Chiarella v. United States,* 445 U.S. 222, 236–37, 100 S.Ct. 1108, 1118–19, 63 L.Ed.2d 348 (1980); *Rewis v. United States,* 401 U.S. 808, 814, 91 S.Ct. 1056, 1060, 28 L.Ed.2d 493 (1971); *Dunn v. United States,* 442 U.S. 100, 106–07, 99 S.Ct. 2190, 2194–95, 60 L.Ed.2d 743 (1979).

## Conclusion

Porcelli was not charged with collecting sales taxes and thereafter failing to remit to New York tax dollars that belonged to New York. The jury charge described his offense as defrauding New York of "sales taxes due on the retail sale of gasoline." Porcelli owed those taxes under New York law because he had not collected the taxes. He owes New York a debt, but he has not deprived New York of *its* money or property. After *McNally*, his conduct in failing to pay his sales tax debt is not within the scope of the federal mail fraud statute. The alternative theory that he deprived

New York of its property by concealing its chose in action was neither charged nor submitted to the jury and may not be used to uphold the conviction. We should not strain to uphold a federal conviction for nonpayment of state taxes, a matter best left, in the absence of clear federal law coverage, to the abundant civil and criminal authority of the states. For these reasons, I respectfully dissent.